## S02A0968. EDMONDS v. THE STATE.

(569 SE2d 530)

HINES, Justice.

A jury found David Edmonds guilty of malice murder, four counts of felony murder, armed robbery, and two counts of aggravated assault in connection with the fatal shootings of Byron Carmichael and Chrishon Guinn. Edmonds appeals his convictions and the denial of his motion for new trial, challenging the rehabilitation of a prospective juror, the sufficiency of the evidence of venue, and the trial court's instruction to the jury. Finding the challenges without merit, we affirm.[1]

The evidence construed in favor of the verdicts showed that around 10:00 p.m. on May 6, 1998, longtime friends Byron Carmichael and Chrishon Guinn went to fix a flat tire on Carmichael's car. As they approached Cascade Place in Guinn's car, they noticed Harold "Speedy" Miller walking with Shanitha "Shay" Norwood, who was engaged in prostitution; Miller sometimes procured customers for Norwood. Looking for a sexual encounter, Carmichael and Guinn allowed Norwood to get in the car with them and they drove to a rooming house at 761 Cascade Place where Norwood took her customers. A man named James ran the rooming house and for five dollars James let Norwood use a room for prostitution. No one other than James was in charge of the rooming house.

On May 6, 1998, Edmonds was staying at the rooming house. Norwood had smoked drugs with Edmonds and had been intimate

---

[1] The crimes occurred on May 6, 1998. Edmonds was originally indicted for the crimes, along with Shanitha Norwood, on November 24, 1998. On November 23, 1999, a Fulton County grand jury reindicted Edmonds, without Norwood, on ten felony counts: (1) the malice murder of Byron Carmichael; (2) the malice murder of Chrishon Guinn; (3) the felony murder of Byron Carmichael during the commission of armed robbery; (4) the felony murder of Chrishon Guinn during the commission of armed robbery; (5) the felony murder of Byron Carmichael during the commission of aggravated assault; (6) the felony murder of Chrishon Guinn during the commission of aggravated assault; (7) the armed robbery of Chrishon Guinn; (8) the aggravated assault of Byron Carmichael; (9) the aggravated assault of Chrishon Guinn; and (10) possession of a firearm by a convicted felon. Edmonds was tried before a jury December 7-13, 1999, and found guilty of Counts 1, 3, 4, 5, 6, 7, 8, and 9. The jury acquitted him of Count 2, the malice murder of Chrishon Guinn, and also found him not guilty of the lesser offenses of the voluntary manslaughters of Byron Carmichael and Chrishon Guinn. On December 15, 1999, pursuant to OCGA § 17-10-7, Edmonds was sentenced as a recidivist to life imprisonment without parole on Count 1; life imprisonment without parole on Count 4 to be served consecutively to the sentence on Count 1; and ten years in prison on Count 7 to be served concurrently with the sentence on Count 4. The court found that Counts 8 and 9 merged for the purpose of sentencing; Counts 3, 5, and 6 stood vacated by operation of law. Count 10 was not submitted to the jury and was placed on the dead docket. A motion for new trial was filed on December 28, 1999, amended on February 1, 2002, and denied on February 11, 2002. A notice of appeal was filed on March 6, 2002, and the appeal was docketed in this Court on March 18, 2002. The case was orally argued on June 18, 2002.

with him. She knew that Edmonds owed money to a drug dealer named "Fred." When Norwood arrived at the rooming house with the victims, she asked to use the room of a resident named "Red"and paid five dollars for using it. Red then went into Edmonds's room. As Norwood and the victims were discussing what sexual acts they wanted, Edmonds came to the room door and demanded more money for letting them use the room. Carmichael and Guinn refused to pay more and said that they would leave. Edmonds pulled out a pistol, put it to one of the victim's faces, and said, "I tell you what, just give me all your money." Guinn charged Edmonds and they fell into the hallway. Carmichael ran into the hall after them. Norwood heard a gunshot and ran out of the house toward the street. She then heard more gunshots. Shortly thereafter, Edmonds came up the pathway next to the street and told Norwood that he had killed both men. Norwood and Edmonds went to a house across the street and Norwood saw Edmonds looking through some wallets. As Edmonds looked in one of the wallets that contained five dollars, he stated, "Damn, I messed up."

After hearing the gunshots, Miller saw Edmonds going up the driveway to Edmonds's uncle's house which was nearby the rooming house; Edmonds looked like he had been running and "something wasn't right." Edmonds told Miller that he had just shot the two men who were with Norwood, but Edmonds claimed that he did so to protect himself.

Other residents of the rooming house observed that Edmonds carried a .38 revolver, and that he had discussed owing money to the drug dealer, "Fred."

At approximately 11:50 p.m., Officer Britton of the City of Atlanta Police Department responded to a call reporting two dead bodies at 761 Cascade Place. The officer discovered Carmichael's body at the foot of steps leading to a deck in the back yard of the house; Carmichael had no vital signs and there was blood on the deck steps, near the back door, and in the kitchen. Carmichael had bled to death from a fatal gunshot wound to the chest; he had also sustained a bruise to the left side of the head. The path of the bullet was consistent with Carmichael being "stooped" down when he was shot.

The police found Guinn's body sitting upright on the floor in one of the back rooms; furniture in the room had been knocked over. Guinn had sustained a gunshot wound to the pelvis causing him to bleed to death and another gunshot wound to the back of the left thigh. Based on the physical evidence, the police determined that Guinn was shot as he struggled with his assailant in the hallway and that he received the other wound while he was in the bedroom; Carmichael was shot in the chest while he was in the kitchen. The .38 caliber bullets recovered from both victims were fired from the same

handgun, which was determined to be either a Taurus or a Rossi .38 special revolver, or a .357 magnum. No weapons were found on the victims or in the house. Each victim's wallet was missing.

In their investigation of possible suspects, the police obtained Norwood's name and spoke with her; Norwood told them that Edmonds was involved. The police then received information about a wallet belonging to one of the victims. Edmonds was arrested. En route to the police station, Edmonds volunteered that "he beat him" or "they beat me for two days, that the reason he couldn't get away is because they tied him up"; Edmonds further indicated that "some kind of struggle ensued over a gun and accidentally discharged" and said "that the reason he didn't let go of the gun is because he was in fear for his life."

However, Edmonds testified at trial that Norwood came by the rooming house and asked him for a room; Edmonds went back to sleep and was then awakened by arguing from the adjacent room; Edmonds went to the room and asked them to keep it quiet or leave the rooming house; after receiving a hostile look from Guinn, Edmonds grabbed at some money; Carmichael came out from behind the door and hit Edmonds in the face; both Carmichael and Guinn fought with and injured Edmonds; after being thrown against a door in the struggle, Edmonds pulled a pistol out of his pocket; "the pistol goes off on the floor"; Guinn attempted to take Edmonds's pistol as they continued to fight; while Guinn was straddling and hitting Edmonds, Edmonds fired the pistol; after Guinn rolled off, Carmichael began to attack him; Edmonds tried to run away but Carmichael was screaming and charging at him, so Edmonds turned and shot him; Edmonds took off running. Edmonds denied owing money to the drug dealer, and that he had taken anything from the victims.

1. The evidence was sufficient to authorize a rational trier of fact to find Edmonds guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Edmonds contends that the trial court impermissibly rehabilitated a potential juror during voir dire because the man indicated that he could not be unbiased towards Edmonds.[2] But there is no evidence that Edmonds ever challenged the prospective juror for cause or in any manner indicated to the trial court the belief that the man

---

[2] In argument, Edmonds mentions the trial court's allegedly improper rehabilitation of other members of the venire, but cites no specific examples. He also complains that the trial court made no attempt to rehabilitate a "defense-oriented" venireman. But the record fails to demonstrate any need for rehabilitation of the venireman, and ultimately he was removed by a peremptory strike by the State.

was subject to being stricken for cause.[3] The disqualification of a prospective juror can be waived, either expressly or impliedly. *Kirkland v. State*, 274 Ga. 778, 780, n. 2 (560 SE2d 6) (2002); *Miller v. State*, 233 Ga. App. 814, 815 (1) (506 SE2d 136) (1998).

> The single purpose for voir dire is the ascertainment of the impartiality of jurors, their ability to treat the cause on the merits with objectivity and freedom from bias and prior inclination. The control of the pursuit of such determination is within the sound legal discretion of the trial court, and only in the event of manifest abuse will it be upset upon review.

*Speed v. State*, 270 Ga. 688, 691 (7) (512 SE2d 896) (1999), quoting *Whitlock v. State*, 230 Ga. 700, 706 (5) (198 SE2d 865) (1973). Even assuming that waiver is not present in this case, Edmonds can show no abuse of discretion in the trial court's failure to strike the potential juror for cause. *Carter v. State*, 269 Ga. 420, 422 (4) (499 SE2d 63) (1998). In order for a potential juror to be excused for cause, see OCGA § 15-12-164 (a), the person must be shown to hold an opinion of the guilt or innocence of the defendant that is so fixed and definite that the person will be unable to set the opinion aside and decide the case upon the evidence or the court's charge upon the evidence. *Corza v. State*, 273 Ga. 164, 166 (3) (539 SE2d 149) (2000). That was not the case here. Initially, the prospective juror stated his belief that there was a problem "with the system" of "too many handguns out there" and expressed his concern that such belief might affect his ability to be an impartial juror. However, after questioning by the trial court, the man responded that he thought he could separate his belief about handguns from his job as a juror and base an impartial decision in the case on the evidence presented in the courtroom. See *James v. State*, 270 Ga. 675, 678 (8) (513 SE2d 207) (1999).

3. Edmonds next contends that venue of the crimes in Fulton County was not established beyond a reasonable doubt. See *Jones v. State*, 272 Ga. 900, 901 (2) (537 SE2d 80) (2000). But that is not so. Testimony was that the crimes occurred at 761 Cascade Place. A police officer involved in the case was asked directly whether 761 Cascade Place was in Fulton County, and the officer responded, "[y]es, it is, City of Atlanta." Contrary to Edmonds's assertion, the statement was not ambiguous but was plainly an affirmative response that the scene of the crimes was in Fulton County, as well as being in the City of Atlanta. Compare *Graham v. State*, 275 Ga.

---

[3] It appears that the defense used a peremptory strike against the venireman in question.

290 (565 SE2d 467) (2002). The evidence of venue in Fulton County was sufficient.

4. Finally, Edmonds contends that the trial court erred by failing to give his requested jury charge on "no duty to retreat" because evidence was introduced, either directly or indirectly, that he could or should have retreated and because his sole defense was self-defense. But Edmonds's own testimony was that he tried to run away from the victims. And even though the State cross-examined Edmonds about his testimony that he was running in different directions in attempts to get away, the State never asked Edmonds why he did not leave the scene of the altercation, thus, not focusing on any failure by Edmonds to retreat. See *Stewart v. State*, 257 Ga. 211, 213 (3) (356 SE2d 515) (1987); compare *Jackson v. State*, 237 Ga. App. 746 (516 SE2d 792) (1999). Also, contrary to Edmonds's assertion, his trial testimony and evidence of his statements to police raised not only the defense of self-defense but also the question of an accidental shooting. However, even assuming that retreat was in issue and Edmonds's sole defense was self-defense, the failure to charge on the lack of duty to retreat would not require reversal because Edmonds's defense of self-defense was fairly presented to the jury. *Johnson v. State*, 253 Ga. 37, 38 (315 SE2d 871) (1984). The jury heard the evidence of Edmonds's claim that the victims attacked him and that he feared for his life, and the trial court fully instructed the jury on the law of justification and self-defense.

*Judgments affirmed. All the Justices concur.*

DECIDED SEPTEMBER 16, 2002.

*James C. Parks, Jr.*, for appellant.

*Paul L. Howard, Jr.*, District Attorney, *Bettieanne C. Hart, Peggy R. Katz, Marc A. Mallon*, Assistant District Attorneys, *Thurbert E. Baker*, Attorney General, *Ruth M. Bebko*, Assistant Attorney General, for appellee.