## A04A0173. GIBSON v. THE STATE.
### (600 SE2d 417)

SMITH, Chief Judge.

Thomas E. Gibson was indicted jointly with his nephew, Gary M. Gibson, Jr.,[1] on 21 counts of burglary. The trial court granted Gibson's motion for a directed verdict of acquittal on one count. A jury acquitted Gibson on one count and found him guilty of the remaining nineteen counts. Judgments of conviction and sentences were entered on the jury's verdicts, and Gibson appeals following the denial of his motion for new trial. He challenges the sufficiency of the evidence to support his convictions, the denial of his motions for severance of offenses and for mistrial, and the trial court's failure to excuse one particular juror for cause. Finding no error, we affirm.

1. We first address the sufficiency of the evidence. Construed to support the jury's verdicts, the evidence presented at trial showed that Gibson and his nephew committed a series of burglaries in Baldwin County and surrounding counties during a four-month crime spree between November 14, 2000, and March 22, 2001. The burglaries were all accomplished with the same speed and in the same manner, by kicking in a door or window to gain entry to an unoccupied home during the daylight hours and quickly grabbing certain types of property — jewelry, guns, and electronic equipment.

Gibson's nephew testified at trial and admitted participating, along with his uncle, in all the burglaries charged except one. He testified that he and his uncle developed a pattern. Gibson, who always drove, would pick him up about 8:00 in the morning in a borrowed car. They would then proceed to the targeted home, where the nephew would knock on the door to make sure no one was home. If someone came to the door, the nephew would "just ask for anybody, just any kind of name." If the home was unoccupied, they would kick in the door or a window. Getting "[i]n and out quick" was important to them, and they stayed in each home only a few minutes, targeting jewelry, computers, TVs, stereos, and guns, most of these "in plain sight." They filled the back seat of the vehicle they were driving and emptied it at Gibson's home. Gibson disposed of some stolen items by selling them "to a guy named Al" who lived down the street from him.

Officers executed a search warrant for the home of Alvin Smith, who lived on Gibson's street, and found stolen television sets. Smith was charged and pled guilty to theft by receiving before testifying at trial. He testified that for more than a month before his arrest, he had

---

[1] Gary, Jr. pled guilty to 17 of the counts and was sentenced to 50 years to serve.

been buying electronics from Gibson at rates below retail and reselling them at a profit. Items seized from Gibson's residence and Smith's home, as well as from local pawn shops, were identified as stolen and claimed by their rightful owners, who testified at trial. None of the stolen guns was recovered. All of the stolen jewelry recovered was found either in Gibson's home or in pawn shops.

Physical evidence was found at the crime scenes, including footprints on the doors kicked in. The footprints were compared, and the lead detective concluded that all impressions were made by one of three different shoes. One such pair was found in a car located at the nephew's father-in-law's house, and a second pair was found in Gibson's home.

A neighbor of one of the burglarized homes testified she saw a gray Ford Taurus leaving her neighbor's house at a high rate of speed and wrote down its tag number, which was traced to the nephew's father-in-law. The neighbor told officers she had seen two men in the car, and her descriptions matched those of Gibson and his nephew and corroborated the description of Gibson's clothing given by the nephew. Another witness testified she was babysitting in the vicinity of the burglaries when a man she did not know came to the door, asking for someone who did not reside there.

Gary, Jr.'s sister-in-law testified that she had been living with her sister and Gary, Jr. at the time the burglaries were committed, and that approximately twice a week Gibson would arrive to pick up his nephew for the day. When Gibson and Gary, Jr. returned, they had "little boxes of jewelry and stuff like that." She also observed them reading an article in the local newspaper about the burglaries and "talking about it and cutting up about it," and that Gibson remarked to his nephew: "They're not going to catch us." Another witness testified she had bought a television set from Gibson that turned out to have been stolen. This evidence was more than sufficient to authorize the jury to find Gibson guilty of the series of burglaries under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

We find no merit in Gibson's specific argument that his nephew's testimony was uncorroborated as to seven of the counts. In felony cases, of course, the uncorroborated testimony of an accomplice is insufficient to authorize conviction. OCGA § 24-4-8. But it is well established that "slight evidence of corroboration connecting the defendant with the crime satisfies the requirements of OCGA § 24-4-8 and that evidence may be entirely circumstantial." (Punctuation and footnote omitted.) *Jones v. State*, 258 Ga. App. 852, 853 (576 SE2d 18) (2002). The sufficiency of the corroboration of an accomplice's testimony is peculiarly a matter for the jury. *Mosier v. State*, 223 Ga.

App. 75, 76 (476 SE2d 842) (1996). Here, the jury was authorized to find sufficient corroboration of the nephew's testimony as to each of the challenged counts.

As to Count 9, the nephew gave an accurate description and correct location for the burglarized house, and he testified that all they took was a television and a VCR. This was corroborated by the victim. The timing and method were consistent with the other burglaries, as these items were taken during the day while the victim was at work. The victim of the burglary in Count 10 testified that a gun case in his living room was broken and the guns removed along with a television set in the back of the house. But although the living room's entertainment center had been pulled out, the television there was not taken because the back had to be unscrewed to remove it. This corroborated the testimony of Gibson's nephew that the television "was bolted down to" the entertainment center, and he "couldn't get the TV out of it or it just wouldn't fit out of it or something."

The victim of the burglary in Count 12 testified that the only property stolen from his home was a 35-inch television set and four guns. This corroborated the nephew's testimony that a large television set — he thought "about a 36 inch TV" — was taken. As to Count 13, the victim testified that some electronics equipment was taken, but a large television set in the same room was not removed. Again, this corroborated Gibson's accomplice's explanation that he and Gibson would have taken the television, but it was a big screen television and "it was too big to haul."

The victim of the burglary in Count 14 testified that when his alarm company notified him that his home alarm had sounded, he rushed home. Upon arrival, he discovered that nothing had been removed from the home, but his 14-year-old daughter's jewelry box had been discarded on the living room couch. This victim's home was located on a dirt road, and the nephew remembered its location and how he and Gibson got there. The nephew also testified that Gibson retrieved a small wooden jewelry box from a bedroom, but when a loud, piercing alarm sounded they threw the box down on the living room couch and left without taking anything.

The nephew described several particulars of the burglary in Count 16 in great detail. He described a "big tall jewelry box" that sat on the floor. He also described taking what they believed was a DVD player but turned out in fact to be a "dish satellite thing." The victim corroborated this testimony, testifying that the burglars had "snatched a satellite dish from my little boy's room" and approximately $14,000 worth of jewelry from "a big jewelry box full of jewelry." Gibson's nephew testified about the burglary in Count 20 that he and his uncle had not found anything they wanted in the house. He also recalled a loud alarm in that house that did not ring but announced "burglary"

repeatedly in a loud voice. The victim corroborated the fact that nothing was taken, and he also described his unusual alarm which, instead of blaring, announces "burglary, burglary, burglary."

This evidence sufficiently corroborated the testimony of Gibson's accomplice to authorize the jury to find Gibson guilty as charged with respect to those counts of the indictment.

2. Gibson next contends the trial court erred in denying his motions for mistrial made after two witnesses for the State placed his character in issue. Gibson's contention arises out of the testimony of Detective Robert Langford who, on two occasions, mentioned robberies outside Baldwin County, and the testimony of Gary Michael Gibson, Sr.,[2] who mentioned that he became suspicious because Gibson "has a past."

In the first instance raised by Gibson, Detective Langford testified he determined that a television set recovered from Gibson's nephew's home was stolen after comparing the items found with reports from the Baldwin County robberies "along with Jasper and Putnam County burglaries." With the exception of one in Jasper County, these burglaries outside Baldwin County were previously ruled inadmissible by the trial court at the pretrial hearing on the State's motion to introduce similar transactions, and when Langford mentioned them Gibson immediately objected and moved for a mistrial.

Gibson also moved for mistrial when Langford again mentioned both Jasper and Putnam Counties while discussing the footprint comparisons. The witness began talking about "going to Jasper County and Putnam County and comparing my notes and pictures with the other two agencies." Continuing, he stated that from these travels, he "was more certain that the —" when he was interrupted by Gibson's motion for mistrial.

Gibson made another motion for mistrial during the testimony of his brother, who was asked by the prosecutor if he had become suspicious that his brother was committing burglaries. The witness replied: "There is a lot of stuff and he does have a past."

We note that in two of the three instances, the trial court gave the jury instructions to ignore or disregard the witnesses' improper comments and to give them "no consideration in your deliberations." And in these instances, Gibson did not renew his motions immediately after the trial court's curative instructions. He has therefore waived review of the denial of these motions. *Anderson v. State*, 236 Ga. App. 679, 685 (513 SE2d 235) (1999).

---

[2] Gary Michael Gibson, Sr. is the brother of Thomas Gibson and the father of Gary Michael Gibson, Jr.

Moreover, Langford's two statements did not specifically connect Gibson to any burglaries outside Baldwin County, and Gibson's brother was not explicit as to the nature of Gibson's "past." Given that Gibson was on trial for twenty-one burglaries, we conclude that it is highly improbable that a vague connection with two other burglaries or a hint that he may have had a criminal history contributed to the jury's verdict. We find no abuse of discretion in the trial court's denial of Gibson's motions for mistrial.

3. Gibson maintains that the trial court's denial of his motion to sever the offenses was error, because the large number of burglaries for which he was on trial led to a "smear effect," even if the evidence was insufficient as to each count individually. We find no merit in this enumeration.

First, we have decided in Division 1 that the evidence was sufficient to support each of Gibson's convictions. Second, contrary to Gibson's argument, nothing in the record suggests that the jury was confused or misled by the numerous charges and the evidence presented to support them. On appellate review, when "joinder is based on the same conduct or on a series of acts connected together and evinc[ing] ongoing criminality, severance lies within the sound discretion of the trial court." (Citations and punctuation omitted.) *Whitfield v. State*, 217 Ga. App. 402, 403 (1) (457 SE2d 682) (1995). A ruling on a motion to sever offenses will therefore be affirmed unless the trial court abused its discretion. Here, as in *Whitfield*, the offenses may have been separated in time, but we find no abuse of discretion in the trial court's denial of the motion for severance because "the facts show a continuing course of criminal conduct." (Citations and punctuation omitted.) Id.

4. Relying upon the Supreme Court's recent opinion in *Kim v. Walls*, 275 Ga. 177 (563 SE2d 847) (2002), Gibson challenges the trial court's refusal to excuse a juror for cause. The venireman in question was the rector of a church in Milledgeville, where the case was tried, and also an adjunct professor of ethics at a local college. He stated on voir dire that he had counseled and prayed with a couple who were parishioners and also victims in one of the burglaries. The assistant district attorney who tried the case was also a parishioner, as was at least one other witness for the State. This juror also stated that he knew and admired the local sheriff both socially and professionally, although they were not close friends. Nevertheless, the juror in question stated several times that he "would definitely still be fair and impartial."

Gibson argues that the juror's many relationships with individuals connected to the case or the trial demonstrate that the juror could not be impartial. While we agree that the impartiality of this particular juror in this particular case was a close question, we find that

the trial court did not abuse its discretion in denying the defense request to excuse the juror for cause.

In *Kim*, the Supreme Court of Georgia held that trial courts have "broad discretion" to rule on excusals for cause and may be reversed only if a manifest abuse of discretion is shown. Id. at 178. No specific test exists for disqualifying a juror in a civil case, but "when a prospective juror has a relationship with a party to the case that is either close or subordinate, or one that suggests bias, the trial court must do more than 'rehabilitate' the juror through the use of any talismanic question." Id. But in *Kim*, plaintiff's counsel's questioning of a prospective juror who had a professional relationship with the defendant was inappropriately curtailed. Id. at 177. The Supreme Court was careful to state that its holding did not change its adherence to the "fundamental principle" set forth in *Cohen v. Baxter*, 267 Ga. 422 (479 SE2d 746) (1997), that "the law presumes that potential jurors are impartial, and that the burden of proving partiality still rests with the party seeking to have the juror disqualified. Nor do we in any way limit the extremely broad discretion of trial courts in deciding whether to exclude a juror for cause once an adequate inquiry has been conducted." (Citations and punctuation omitted.) Id. at 179.

This case is distinguished in several respects. First, this was a criminal rather than a civil trial. OCGA § 15-12-164 (a) sets out specific questions that must be asked to disqualify jurors in criminal trials. "In order for a potential juror to be excused for cause, the person must be shown to hold an opinion of the guilt or innocence of the defendant that is so fixed and definite that the person will be unable to set the opinion aside and decide the case upon the evidence or the court's charge upon the evidence." (Citations omitted.) *Edmonds v. State*, 275 Ga. 450, 453 (2) (569 SE2d 530) (2002). Personal knowledge of, or a relationship with, any witness, attorney, or party in the case is therefore disqualifying only if it has created a fixed opinion of guilt or innocence or a bias for or against the accused.

Second, since the burglary occurred during the day while the victims were at work, leaving the victims completely in the dark as to the identity of the burglar, counseling with their minister would not itself have created any bias for or against the defendant. In fact, the juror testified that nothing said by the victims "led me to think anything about the defendant one way or the other. What I heard was their feelings about being burglarized." And although this juror did know the assistant district attorney, he also knew the prosecutor's brother, who was the defense attorney, and he had been to his home. It is inevitable in a city the size of Milledgeville that ministers and others whose occupations bring them into contact with the public will

cross paths with many court officials, attorneys, and law enforcement personnel, and inevitably some parishioners will be affected by crime.

Finally, this juror's knowledge of the case and relationship with several members of the cast of characters involved had no bearing on whether this particular defendant was innocent or guilty, and the juror was completely confident in his ability to be fair and impartial. Mindful of the Supreme Court's affirmation in *Kim* of the venerable presumption regarding the impartiality of potential jurors and the broad discretion given trial courts in juror disqualification matters, we conclude here that adequate voir dire was conducted and the trial court did not abuse its discretion in denying the defense request to disqualify this juror.

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED MAY 19, 2004.

*Waddell, Emerson & Buice, John H. Bradley*, for appellant. *Fredric D. Bright, District Attorney, Stephen A. Bradley, Assistant District Attorney*, for appellee.