A04A1208. QUENGA v. THE STATE.
(605 SE2d 860)

SMITH, Chief Judge.

Joseph Quenga was convicted of rape, sexual battery, false imprisonment, and two counts of kidnapping, all stemming from three separate incidents occurring on June 23, 2000, October 22, 2000, and December 12, 2000. Following the denial of his motion for new trial, he appeals, contending that the trial court erred in denying his motions for severance of the offenses, his motion for a directed verdict, and his request to charge on a lesser included offense. We find no error and affirm.

On appeal from a criminal conviction, this court construes the evidence in a light most favorable to the jury's verdict, and the defendant no longer enjoys a presumption of innocence. *Hughes v. State*, 266 Ga. App. 652 (1) (598 SE2d 43) (2004). So construing the evidence, the record shows that Quenga was a Savannah police officer assigned to patrol duty in Precinct Three on the midnight shift. On June 23, 2000, Quenga was on duty when he stopped the first victim on a traffic violation at approximately 3:00 a.m. The victim had just left a lounge where she had been drinking, and she acknowledged she crossed the white line. She admitted she had been drinking when asked. Quenga placed her in the back seat of his patrol car and transported her to Precinct Three, where he administered a breath test. The victim described the precinct as being "empty, there wasn't

a soul there." Quenga "filled out some reports" and told the victim he would take her back to her car.

Instead, however, he drove past the victim's car and took her to a dark, secluded area behind a hospital. When another patrol car approached, Quenga pushed the victim into a muddy ditch until the other officer had left. Quenga then instructed the victim to lie face down on the back seat of the patrol car, forced her to take her pants down, and raped her. He then drove her back to her car, threatened her, and followed her home. Quenga was eventually charged with rape and kidnapping of this victim.

The next incident occurred on October 22, 2000. Quenga stopped the second victim, a student, who was driving alone at approximately 6:00 a.m. The victim told Quenga that she had spent the night with a friend, awakened early, and decided to return home. At first she denied drinking, but after repeated questioning admitted it. A field breath test showed a blood alcohol level under the limit. Nevertheless, the victim realized that she "was underage so it didn't matter how much I had to drink."

She became very upset and was crying. She told Quenga her father was a corporal in the Chatham County Police Department. Quenga let her calm down in the back seat of his patrol car, and when she calmed down, she returned to her own car and Quenga followed her back to her friend's home. Just as the victim thought Quenga was going to let her go, he instructed her to get back into the patrol car. He drove to the secluded area of a small shopping center that could not be seen from the road.

He told her she had to be searched, and if he called a female officer to search her she would "get a DUI." He said if he performed the search himself, however, no one would know about it, and she would not be charged. She decided to permit him to search her. Performing the "search," he first placed his hands under her shirt and patted her bra. He then instructed her to pull her pants down, and touched her "inner thigh and . . . private parts," then told her he was "almost done." He then returned her to the back seat of the patrol car and drove her to her friend's residence.

Before leaving, Quenga gave her his telephone number and instructed her to call him "at the beginning of the week," just "to make sure everything was okay." He added that if she "didn't tell anybody, everything would be okay." Although he made the victim "sign a ticket," he did not give a copy to her. Quenga told the victim that if she did not call him he would "turn the ticket in." The citation was introduced into evidence, showing that the victim signed the form but no violation was written on it.

After this incident, Quenga and the victim spoke to each other on several occasions and met once at a restaurant, where Quenga gave

the victim "Mace and a rose." Although the victim had told her friend immediately about the incident, she did not report it to the police until approximately three months later, when her father learned of the incident and approached her about it. The victim and her father reported the incident to "Internal Affairs," where the victim spoke with a detective. Quenga then was charged with sexual battery and kidnapping.

The third incident took place on December 12, 2000. This victim was driving her car with her boyfriend as a passenger at approximately 1:00 or 1:30 a.m. when she was stopped by Quenga because she improperly veered from her lane. When she pulled over, she explained to Quenga that the car had swerved because she and her boyfriend were fighting. When Quenga questioned her, she admitted drinking, and he placed her in the back of the patrol car. Quenga spoke with her boyfriend briefly and told him to lock the victim's car "and go ahead and find another ride," because she was going to the police station. Quenga administered a field blood alcohol test, took the victim's car keys, and transported her to the precinct, where he administered a breath test. Her blood alcohol level registered as 0.12. The victim testified that when she asked if Quenga would let her call someone to pick her up so she "wouldn't, you know, get a DUI charge," Quenga told her, "[w]ell, let's go talk about it."

They then returned to his patrol car. The victim thought they were driving toward her car, but instead Quenga drove to a wooded area at a golf club, opened the car door, and asked her if she "would do anything to get off this charge." In response, the victim began crying "really hard." Quenga "got quiet," and "[t]wo minutes later," he reentered the car and drove the victim back to her car, where she was relieved to find that her boyfriend was still waiting. Quenga allowed the victim's boyfriend to drive her car to her home, and he followed in his patrol car with the victim in the back seat. When they arrived at the victim's home, he gave her a citation for failure to maintain lane and no proof of insurance. The victim did not report Quenga's conduct to the police department. The victim appeared on the appointed court day. Quenga spoke with the judge, and the charges were dismissed. Sometime after the court date, a police officer contacted this victim when he noticed that another woman who had been pulled over by Quenga was in the courtroom with her and that both charges were dismissed. Quenga was charged with kidnapping this victim.

An experienced Savannah police officer was qualified as an expert in standard operating procedure for traffic stops. He testified that for the safety of both the officer and the public, when an officer makes a stop, he is required to notify the dispatcher by radio that he is doing so, which is called "holding out." If the officer's preliminary investigation leads him to believe the driver is intoxicated and

warrants a breath test, the officer is again required to notify the dispatcher that he or she is en route to the precinct. If the driver is a juvenile or of the opposite gender, the dispatcher must be notified of the mileage reading on the patrol car's odometer, and the dispatcher replies with the time. Upon arrival at the precinct, the same routine applies. The dispatch center maintains a digital record of every radio and telephone communication. The expert testified that he and a detective had tried to find a record of Quenga "holding out" on the second incident, which occurred in October, and they could find no record of that stop in the log. The other two stops were logged. But in the third stop, "five seconds after he held out en route, he asked for a case report number," but no report was ever written. Further, there was no entry in the Intoxilyzer log book for either the first victim or the third.

A detective testified that she obtained a search warrant for Quenga's personal vehicle and executed it. She found six ticket books. She also found that a number of tickets written were left in the ticket book, and some tickets were torn out but with all carbons intact, indicating that Quenga had written them up but never turned them in, which was unusual. One of these was the ticket written on the first victim. Another was for the second victim, and that ticket was filled out, but no violation was entered. In addition, neither the books in Quenga's vehicle nor the tickets in them were written in sequential order. In the same book, some tickets were written in one month and some in another, which the detective testified is "not normal."

The detective testified that she compiled a list of names from the tickets not turned in. When interviewed, the first victim "broke down" and told the detective what had transpired. The second and third victims were interviewed by another officer. The detective testified that other evidence supported the three victims' claims, including "ticket books, . . . times, . . . inconsistencies of procedures," and evidence that the traffic stops were made but no entries were found in the Intoxilyzer log book. She also identified the dark, isolated area where the first victim testified she was taken as a familiar and known unlit road where officers sometimes stopped to rest that was not accessible to the public at that time.

The defense presented several character witnesses, who testified that Quenga's reputation in the community was good and that he was considered honest. Quenga also took the stand in his own defense. He admitted all three stops but denied any impropriety.

1. Quenga contends the trial court erred in denying his motion for a directed verdict because no "physical evidence" was presented to support any of the charges and none of the alleged victims reported Quenga's alleged improprieties to the police. We do not agree.

A motion for a directed verdict of acquittal should be granted only when there is no conflict in the evidence and the evidence demands a verdict of acquittal as a matter of law; a challenge to the sufficiency of the evidence in connection with the denial of a directed verdict of acquittal is evaluated based on the standard set forth in *Jackson v. Virginia*[, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979)]. . . . As long as there is some evidence, even though contradicted, to support each necessary element of the state's case, the jury's verdict will be upheld.

(Citation and footnotes omitted.) *Smiley v. State*, 260 Ga. App. 283 (1) (581 SE2d 310) (2003). Here, all three victims testified to Quenga's crimes. An expert testified regarding standard police procedure and showed that police logs indicated the times Quenga held out on two of the victims. A detective testified to the irregularities in Quenga's ticket books. This was more than sufficient evidence for the jury to find Quenga guilty of the crimes charged under the standard of *Jackson v. Virginia*. The trial court did not err in denying Quenga's motion for a directed verdict.

2. Quenga maintains the trial court erred in denying his motion to sever the offenses. He argues that severance was necessary to protect him from prejudice resulting from the joint disposition of charges that are unrelated and from the "smear" effect produced by confusion of the jury regarding law and evidence. See *Brown v. State*, 230 Ga. App. 190, 193 (2) (495 SE2d 858) (1998). It is well established that severance must be granted when "offenses have been joined solely on the ground that they are of the same or similar character." (Citation, punctuation and footnote omitted.) Id. at 190 (1). But if the offenses have been joined because they are based on the same transaction, or on a series of connected acts, or on a series of acts that constitute parts of a single scheme or plan, the trial court may, in its discretion, grant severance if it is necessary to achieve a fair determination of the defendant's guilt or innocence of each offense. Id. at 190-191 (1). "The court should consider whether in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense," (citation omitted) *Stewart v. State*, 277 Ga. 138, 139 (587 SE2d 602) (2003), and "balance the interest of the defendant with the interest of the State. [Cits.]" Id.

Here, the trial court concluded that the similarities among the incidents "reveal a scheme or a common modus operandi." (Citation and footnote omitted.) *Brown*, supra at 192 (1). The incidents all took place in the early morning hours and involved Quenga's use of his police authority to commit the crimes. The victims were all female,

and although the charges differed, all three victims claimed that Quenga's conduct was overtly sexual. In all instances, Quenga wrote a ticket but did not prosecute the citation. The offenses were all committed between June and December of 2000. Although the offenses may have been separated in time, "the facts show a continuing course of criminal conduct." (Citation and punctuation omitted.) *Gibson v. State*, 267 Ga. App. 473, 477 (3) (600 SE2d 417) (2004). The trial court concluded that even if three separate trials were held, evidence concerning each incident would be admissible at a trial of each other incident as a similar transaction.

In *Stewart*, supra, however, the Georgia Supreme Court added a cautionary instruction, emphasizing that

> [t]he fact that evidence of one offense would be admissible in a trial of another offense is a relevant consideration in determining whether to sever, but it does not end the inquiry. A trial court must still determine if severance of the offenses would promote a fair determination of guilt or innocence as to each offense.

(Citations omitted.) Id. at 140. Here, the trial court was careful to heed that instruction from the Supreme Court. Although the trial court's order denying Quenga's motion did point out that all offenses could be introduced as similar transactions, "the court was not guided by this fact." Contrary to Quenga's assertion that the trial court "failed to adequately complete the requisite inquiry," the trial court noted explicitly that it had given "careful consideration" to Quenga's motion to sever, and had concluded that "the number of charges and the complexity of the evidence would not preclude the trier of fact from distinguishing the evidence and applying the law intelligently as to each offense." The court found that Quenga's course of conduct could be well analyzed by the jury, and "proper instructions given . . . would insure fairness to the defendant." Severance was in the discretion of the trial court, and the trial court did not abuse its discretion in refusing to sever the offenses.

3. Quenga also contends that the trial court erred in charging the jury on the rape count by denying his written request to charge the jury on the lesser included offense of sexual battery.

At the charge conference, Quenga agreed with the trial court that under the facts of his case, a charge on sexual battery as a lesser offense of rape was inappropriate and withdrew his request for that charge. While ignoring the fact that he withdrew the request, Quenga correctly points out that if a defendant requests a charge on a lesser included offense and there is any evidence to support that lesser included offense, it must be charged. *Elrod v. State*, 265 Ga. App. 335,

337 (593 SE2d 879) (2004). But it is also true that "[a] requested charge on a lesser included offense must be given only if the evidence actually warrants the requested charge." (Citation and punctuation omitted.) *Cotton v. State*, 274 Ga. 26 (2) (549 SE2d 71) (2001).

As Quenga agreed at the charge conference, under the facts of this case, no evidence supported a charge on sexual battery as a lesser included offense of rape. The evidence concerning the rape was obviously conflicting. The first victim testified that Quenga raped her. Quenga testified that he did nothing wrong. The jury therefore had a choice between rape and acquittal on this charge. The evidence would authorize nothing else. "Where, as here, the evidence establishes either the commission of the completed offense as charged, or the commission of no offense, the trial court is not authorized to charge the jury on a lesser included offense." (Citations and punctuation omitted.) *Seay v. State*, 276 Ga. 139, 140 (2) (576 SE2d 839) (2003).

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED OCTOBER 20, 2004.

*Weiner, Shearouse, Weitz, Greenberg & Shawe, Michael L. Edwards*, for appellant.

*Spencer Lawton, Jr., District Attorney, Nancy G. Brimberry, Assistant District Attorney*, for appellee.

