**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 2, 2015**

# In the Court of Appeals of Georgia

A14A1715. PARROTT v. THE STATE.

PHIPPS, Chief Judge.

For the shooting death of Cody Ward, a jury found Joseph Parrott guilty of voluntary manslaughter (as a lesser included offense to the charge of murder), aggravated assault, and possession of a firearm during the commission of a crime. Ward was initially sentenced on all three counts. But in post-conviction proceedings, the trial court vacated the aggravated assault sentence, merging the aggravating assault into the voluntary manslaughter for sentencing purposes.

In this appeal, Parrott contends that the trial court erred by failing to take corrective action when the prosecutor made an improper remark during closing argument, by not including certain instructions in its final charge to the jury, and by

rejecting his claim of ineffective assistance of trial counsel. For reasons that follow, we affirm.

The trial evidence showed the following. Parrott was 16 years old with an eighth-grade education when he fatally shot 19-year-old Ward. Parrott and Ward were neighbors, and part of the same circle of friends. During a temporary break-up between Ward and his girlfriend, Parrott had sex with her. Ward found out; he was upset and wanted to meet with Parrott.

On the day in question, November 21, 2008, Parrott agreed to meet Ward at Ward's home to discuss the situation. A mutual friend had left Ward's home and walked to Parrott's residence to accompany Parrott back to Ward's house. As the mutual friend recounted at trial, in several calls he had with Parrott earlier that day, Parrott had expressed concern that "we were going to jump him [Parrott]." So as they walked together toward Ward's house, Parrott carried with him a rifle. It was about 6:00 p.m.

Rather than walking directly to Ward's residence, Parrott and the friend headed first to the residence of the friend's girlfriend. She lived across the street from Ward. When Parrott and his friend had walked about 50 yards up the gravel driveway of the

2

girlfriend's residence, they heard footsteps behind them and looked back. It was Ward.

Parrott's friend gave this account of the shooting that ensued. Ward – who "wasn't running, he was just steadily walking up the driveway" – was about 10 feet away. Parrott told Ward to stop; Ward stopped and put his hands up in the air. Parrott "started shooting I think he shot about four times." Ward collapsed. As Ward lay on the ground, Parrott shot him several times in the back, then ran into nearby woods.

Ward was unarmed when he was fatally shot. As was later determined, one bullet entered Ward's front abdomen and passed through his aorta; a second bullet entered Ward's back and passed through his kidney, liver, and diaphragm; a third bullet entered his upper buttock and lodged in his sacrum. The pathologist who conducted the autopsy opined that, while the third bullet was a "minor gunshot wound," either of the other two bullets could have inflicted fatal injury.

A police investigator assigned to the case testified that Parrott was located the morning after the shooting and brought into the sheriff's office. Parrott agreed to give a statement. Therein, Parrott admitted that he had discharged the rifle about four times before Ward hit the ground. The investigator described that, as Parrott recounted the

incident, "[Parrott] was very cold. It was almost like he didn't care. . . . There was no emotion at all."

Parrott, who was the sole defense witness, admitted shooting Ward and further gave this account. When his friend arrived at his house, the friend told him that they were headed to Ward's house. The friend had told Parrott that Ward had been showing his guns to friends who were at his house, so Parrott carried a gun with him. As Parrott explained, "I really didn't intend – I just figured if I had it maybe he wouldn't mess with me." When they reached Ward's driveway, however, the friend told Parrott that he wanted to first stop by his girlfriend's residence. As they walked up the driveway of her residence, Parrott recalled, "I heard someone come up behind me." Parrott testified that he was already afraid, and so, "[b]efore I even turned around I pulled the gun down." Parrott described that "[Ward] was running," and, "I said stop. And – But I was already nervous – my hands were shaking – and I just pulled the trigger." In a matter of two seconds, Parrott estimated, he had pulled the trigger three or four times. He added, "I was shooting towards [Ward], but I really wasn't trying to shoot him."

1. Citing OCGA § 17-8-75,[1] Parrott contends that the trial court erred by failing to take curative action when the prosecutor included what he claims was a "future dangerousness" remark during closing argument.[2]

It is well settled that the burden is on the appellant "who asserts error to show it affirmatively by the record";[3] further, "an appellant, in order to secure a reversal, must demonstrate not only error but harm."[4] But as Parrott conceded in his appellate brief, closing arguments were not transcribed.[5] "[W]here the transcript does not fully

---

[1] ("Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.")

[2] See *Jones v. State*, 288 Ga. 431, 433-434 (704 SE2d 776) (2011) (reiterating that "it is improper for a prosecutor to argue to the jury during the guilt-innocence phase of a trial that if the defendant is found not guilty, the defendant will pose a threat of future dangerousness").

[3] *Griffin v. State*, 265 Ga. 552, 555 (10) (458 SE2d 813) (1995), quoting *Roach v. State,* 221 Ga. 783, 786 (4) (147 SE2d 299) (1966).

[4] *Griffin*, supra at 554 (6) (citation omitted).

[5] See, however, *Scott v. State*, 290 Ga. 883, 885 (2) (725 SE2d 305) (2012) ("A closing argument is to be judged in the context in which it is made.") (citation omitted); *Arrington v. State*, 286 Ga. 335, 346 (16) (a) (687 SE2d 438) (2009) (holding that an alleged error under OCGA § 17-8-75 "is subject to harmless error analysis"); *Walker v. State*, 281 Ga. 521, 524 (5) (640 SE2d 274) (2007) (concluding

5

disclose what transpired in the trial court, the burden is on the complaining party to have the record completed pursuant to OCGA § 5-6-41."[6] Because Parrott did not supplement the transcript in accordance with that statute, this contention provides "nothing for the appellate court to review."[7]

Although Parrott asserts that, through his testimony at the hearing on the motion for new trial, he established that the prosecutor made an impermissible future dangerousness remark, "[t]estimony at the hearing on the motion for new trial in this case is not a sufficient substitute for a transcript" setting forth closing arguments.[8]

---

that the trial court did not commit reversible error by failing to perform its duty under OCGA § 17-8-75, where the improper statement involved speculation about a potential defense appellant clearly did not assert at trial, where it consisted of only one sentence spoken simultaneously with defense counsel's prompt objection, and where the trial court in preliminary instructions before closing told the jury that the argument of counsel was not evidence); *Wright*, supra (concluding that based upon the totality of the circumstances, no reversible error was committed by the trial court's failing to satisfy OCGA § 17-8-75 when the prosecutor made the single comment, "the next time [the defendant] does this, he might shoot somebody").

[6] *Glass v. State*, 289 Ga. 542, 545 (2) (712 SE2d 851) (2011) (citations omitted).

[7] Id. (citations and punctuation omitted).

[8] Id. (citations and punctuation omitted). See generally *Sears v. State*, 290 Ga. 1, 3 (3), n. 2 (717 SE2d 453) (2011) ("[T]he absence of a potentially relevant part of the record is properly construed against the appellant.") (citation omitted); *State v. Nejad*, 286 Ga. 695, 698 (690 SE2d 846) (2010) (holding that "the burden is on the

6

2. Parrott contends that the trial court erred by failing to instruct the jury on the principle that "threats and menaces of what proved to be the unarmed victim could be a sufficient basis for a reasonable man to respond with deadly force."[9]

Parrott acknowledges that he did not request such an instruction, but relies on the rule enunciated in *Tarvestad v. State*:[10] "The trial court must charge the jury on the defendant's sole defense, even without a written request, if there is some evidence to support the charge."[11]

---

party which contends the transcript does not fully disclose what transpired at trial to have the record completed at the trial court pursuant to OCGA § 5-6-41(f)" and "[w]here the transcript is not supplemented, the complaining party does not carry its burden of showing by the record the facts necessary to establish its point"); *Campbell v. State*, 269 Ga. 186, 188 (11) (496 SE2d 724) (1998) ("Because closing arguments were not transcribed, [appellant] cannot show that any impermissible argument was made or that, if it was, he objected thereto."). See further cases cited in footnote 5, supra.

[9] *Facison v. State*, 152 Ga. App. 645, 647 (1) (263 SE2d 523) (1979); see *Sawyer v. State*, 161 Ga. App. 479, 482 (1) (288 SE2d 108) (1982) ("[W]hen the killing is claimed to have been done on account of a reasonable fear in the mind of the slayer, threats accompanied by menaces, though the latter do not amount to an actual assault, may in some instances be sufficient to arouse the fears of a reasonable man that his life is in danger or that a felony is about to be perpetrated upon him.") (citations omitted); Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.16.10 (4th ed.).

[10] 261 Ga. 605 (409 SE2d 513) (1991).

[11] Id. at 606 (citations omitted).

7

Assuming, but not deciding, that such an instruction was authorized by the evidence,[12] we find no reversible error. Parrott states in his brief that "[his] sole defense in the instant case was self-defense"; further, he acknowledges that the trial court charged the jury on self-defense and on justification.

The record illustrates that Parrott's defense was that the state failed to carry its burden of proving that the homicide was not justified.[13] Further, the record confirms that the trial court fully and adequately instructed the jury on justification; self-defense, including the statutory language "reasonably believes" found in OCGA § 16-3-21 (a); and on the state's burden to prove beyond a reasonable doubt that Parrott's actions had not been justified.[14] Although Parrott maintains that the trial court should have given an additional explanatory charge on the "threats and menaces" principle, "[t]he giving of an otherwise correct charge is not rendered erroneous for lack of an

---

[12] The state counters, inter alia, that such a charge was not authorized by the evidence, asserting a lack of any "menace" committed by Ward.

[13] Pursuant to OCGA § 16-3-21 (a), "a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony."

[14] See generally *Hill v. State*, 290 Ga. 493, 497-498 (5) (722 SE2d 708) (2012).

8

additional explanatory charge, in the absence of an appropriate request."[15] Given

these circumstances, Parrott has demonstrated no violation of the rule that requires

that a defendant's sole defense must be charged even when not requested.[16]

3. Parrott contends that the trial court erred by rejecting his claim of ineffective

assistance of trial counsel. Pursuant to *Strickland v. Washington*,[17]

> [t]o prevail on a claim of ineffective assistance of counsel, a defendant
> must show that counsel's performance was deficient and that the
> deficient performance so prejudiced the defendant that there is a
> reasonable likelihood that, but for counsel's errors, the outcome of the
> trial would have been different. If an appellant fails to meet his or her

---

[15] *Smith v. State*, 279 Ga. 172, 174 (2) (611 SE2d 1) (2005) (citation omitted).

[16] See id. at 174-175 (2) (holding that the lack of "an additional explanatory charge" does not amount to a violation of the rule that the trial court must charge sua sponte on a defendant's sole defense if supported by evidence, where jurors were given complete and correct instructions on the defendant's sole defense); accord *Hoffler v. State*, 292 Ga. 537, 542-543 (4) (739 SE2d 362) (2013) ("[E]ven assuming arguendo that there was evidence that [the defendant] was not the original aggressor and that retreat was indeed in issue, the failure to charge on the lack of duty to retreat does not mandate reversal because [defendant's] defense of self-defense was fairly presented to the jury, and the jury was fully instructed on the law of justification and self-defense.") (citation omitted); *Edmonds v. State*, 275 Ga. 450, 454 (4) (569 SE2d 530) (2002) ("[E]ven assuming that retreat was in issue and [the defendant's] sole defense was self-defense, the failure to charge on the lack of duty to retreat would not require reversal because [the defendant's] defense of self-defense was fairly presented to the jury.") (citation omitted).

[17] 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong.[18]

"In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts."[19]

(a) Parrott complains that his trial lawyer did not request a curative instruction after the prosecutor's alleged future dangerousness remark.

Parrott's trial lawyer did not testify at the hearing on motion for new trial. "It is extremely difficult to overcome the presumption of reasonable professional assistance where counsel does not testify."[20] Moreover, as noted in Division 1,[21] the closing arguments were not transcribed. "[S]peculation that error may have occurred

---

[18] *Bridges v. State*, 286 Ga. 535, 537 (1) (690 SE2d 136) (2010) (citations and punctuation omitted.)

[19] Id. (citations and punctuation omitted).

[20] *Maxwell v. State*, 290 Ga. 574, 575 (2) (722 SE2d 763) (2012) (citation and punctuation omitted).

[21] Supra.

is insufficient to show any deficiency on the part of counsel, or prejudice therefrom, and is insufficient to show reversible error."[22]

(b) Parrott posits that his self-defense claim came down to whether the jury "reasonably believed" that he needed to use deadly force. He asserts that his trial lawyer failed to present evidence of what he claims showed "threats and menaces made by the deceased towards [him]" and evidence of what he claims showed "goading and taunting endured by [him] right before the shooting." Further, Parrott complains that his trial lawyer did not request a jury instruction on the principle concerning threats and menaces.[23]

At the hearing on motion for new trial, Parrott adduced evidence of two encounters he had with Ward prior to the day of the shooting, and evidence of contentious phone calls he (Parrott) received on the day of the shooting. Regarding the first such encounter, Parrott showed at the new trial hearing that, about six to eight weeks before the shooting, Ward appeared at his (Parrott's) home at about 3:00 a.m. looking for his (Ward's) girlfriend. Finding her there, Ward became angry and

---

[22] *Norton v. State*, 293 Ga. 332, 339 (7) (d) (745 SE2d 630) (2013) (citation and punctuation omitted).

[23] See Division 2, supra.

an ensuing verbal altercation drew the attention of Parrott's grandfather with whom Parrott was then living. The grandfather demanded that Ward and his girlfriend leave. As the two complied, Ward said to Parrott something to the effect: "I'm going to get you." As Parrott recollected at the new trial hearing, "[Ward] was mad when my granddaddy told him he had to leave."

Regarding a second encounter, Parrott testified at the new trial hearing that, about a week before the shooting:

> [Ward] was driving a truck. And he was coming out the driveway. He said something but he was driving fast, but I didn't say anything to him. I just got out of the way. The way he was driving, I figured I would just move out of his way. But I don't know what he said. He hollered to somebody, but I don't know what he said. . . . I was scared but I don't know what his intentions were. I don't know if he was just trying to scare me or I don't think he was trying to kill me.

To evince at the new trial hearing that multiple phone calls he received on the day of the shooting were relevant to his defense, Parrott testified to the following. Starting at about 4:30 p.m., Parrott began receiving calls from several individuals, including: (i) Ward; (ii) their mutual friend, who would ultimately be with Parrott at the time of the shooting; and (iii) that (mutual) friend's girlfriend, whose driveway would be the site of the shooting. Parrott recounted that, when the telephone calls

12

began, even the mutual friend was cursing him and saying, "I am going to come down there and beat you up"; that during each call, he had told the caller to leave him alone; that although he would hang up, he would immediately get another call; and that in the final phone call, the mutual friend had proposed something to the effect, "[Y]ou all are friends, we need to work this out. . . . I'm gonna come there and we will talk about it . . . and try to work it out."

Parrott maintains on appeal that his trial lawyer's performance was deficient in presenting a defense. Without evidence of those two cited encounters with Ward, without evidence of the multiple phone calls, and without a specific jury instruction on "threats and menaces," Parrott claims that the jury was not able to "fully understand" what was on his mind when he left his residence with a gun and, further, was left without any legal mechanism to assess his claim of self-defense.

There is no merit in Parrott's assertion that his trial counsel's performance was deficient as alleged. The jury *was* apprised that Parrott had become fearful of Ward. In addition to the trial evidence recited above, the jury was presented the following. Concerning the night Ward discovered his girlfriend at Parrott's residence, Parrott's trial lawyer elicited testimony from Ward's former girlfriend that, when Ward confronted her about being there, Parrott "just ran, he flew out." And as she argued

13

with Ward, Parrott's grandfather interjected remarks to Ward, who then began "cussing the grandfather."

Further, defense counsel highlighted on cross-examination of the mutual friend that, on the day of the shooting, the mutual friend repeatedly told Parrott that Ward wanted to talk to him; that Parrott had refused to go to Ward's house because he feared being attacked by Ward; and that only after the friend agreed to accompany Parrott to Ward's house, did Parrott agree to meet with Ward.

Moreover, the investigator who conducted Parrott's police interview elaborated at trial that Parrott had begun his police statement by recounting that, prior to the shooting, he (Parrott) had received numerous telephone calls from his and Ward's friends wanting him to meet with Ward to resolve the discord created by his sexual encounter with Ward's girlfriend; that in one such call, Parrott had been told that Ward wanted to "beat his ass"; that Parrott had told the callers that he was afraid Ward would hurt him; that although he had initially refused their repeated requests to meet with Ward, Parrott was ultimately persuaded to go when a friend agreed to accompany him to Ward's house; and that, when he left his residence to meet Ward, he took his rifle with him.

14

Additionally, Parrott's trial lawyer elicited testimony from another state's witness that, prior to the shooting, Parrott had become aware that Ward owned several firearms. And when he took the stand, Parrott testified that he had brought the rifle with him because he had been told that Ward had been showing off his guns earlier that day.

Hence, contrary to Parrott's claim on appeal, the jury was presented evidence from which it could have concluded that he was fearful of being harmed by Ward; the jury was presented evidence that such fearfulness had prompted him to have the gun with him when he met with Ward; and the jury was aptly instructed on Parrott's claim of self-defense.[24]

(c) Parrott complains that his trial lawyer failed to introduce during the guilt-innocence phase of his trial certain evidence of his family, education, and psychological background.

---

[24] See *Roper v. State*, 281 Ga. 878, 881 (2) (644 SE2d 120) (2007) ("Because the [justification/self-defense] charge that was given was adjusted to the evidence and was not erroneously incomplete, [appellant's] defense counsel was not ineffective in her failure either to object or to request a more expansive instruction.") (citation omitted); *McDaniel v. State*, 279 Ga. 801, 803 (2) (c) (621 SE2d 424) (2005) ("The decisions on which witnesses to call, whether and how to conduct cross examinations, . . . and all other strategies and tactical decisions are the exclusive province of the lawyer after consultation with his client.") (citation omitted); accord *Render v. State*, 288 Ga. 420, 424 (2) (b) (704 SE2d 767) (2011).

On motion for new trial, Parrott presented the testimony of a psychologist with whom he had met for a half-day session in 2012 at the prison where Parrott was incarcerated. The psychologist was qualified at the hearing to give his opinions in the areas of childhood/adolescent forensic psychology and trauma. The psychologist recounted that, during their half-day session, he interviewed Parrott about his family history and administered several tests relating to Parrott's academic function, intelligence, and personality. The psychologist described Parrott's family history as "[v]ery checkered" and "extremely disruptive" – noting that Parrott had lived with several different relatives; that he had not known his father's identity for a number of years; that he had experienced "difficulties" with various "stepfather figures"; that he had lived in foster care; and that when he found his father, he lived with him for a few years until his father died of cancer. The psychologist determined from Parrott's school records that he had been "seen as very difficult to handle"; that he had a "hard time getting along with other people"; that he had demonstrated "inattentive" and "disruptive" behavior; and that he was ultimately removed from general classes and placed in special education classes – not because of intellectual disability, but because of behavioral issues. The psychologist ascertained, based upon his own testing, that "[Parrott] has, at least, average IQ." During their session, Parrott told the

16

psychologist that he had been to psychiatric hospitals for depression and cutting his wrists. The psychologist testified that Parrott's medical record showed that he had been prescribed an antidepressant. The psychologist described Parrott as "jumpy" and "very suspicious of other people and scared of other people." The psychologist testified, "I certainly see [Parrott] as paranoid. I don't know that he is psychotic, but I think he has a paranoid personality." The psychologist elaborated, "[Parrott] was premature as a baby. So he was always, perhaps, shorter than many others." According to the psychologist, Parrott was "very sensitive about his [stature]. He feels very insecure around other people. That kind of person usually wants to have a weapon somewhere close to them to put them more on an equal scale with others around them. So he is very much on the defensive."

Though Parrott argues that his trial lawyer should have defended him based on that evidence of his family, education, and psychological background, "[s]uch after the fact disagreements about trial counsel's approach to the case . . . do not amount to a showing of ineffective assistance of trial counsel."[25]

> While other counsel, had they represented appellant, may have exercised different judgment, the fact that trial counsel chose to try the case in the

---

[25] *Reed v. State*, 285 Ga. 64, 66 (6) (673 SE2d 246) (2009).

17

manner in which it was tried, and made certain difficult decisions regarding the defense tactics to be employed with which appellant and his present counsel now disagree, does not require a finding that the representation below was so inadequate as to amount to a denial of effective assistance of counsel.[26]

Parrott has failed to demonstrate that his trial counsel performed deficiently by not introducing such evidence.[27]

(d) Parrott complains that his trial lawyer did not introduce at the sentencing phase of his trial the cited evidence concerning his family, education, and psychological background.[28]

At the sentencing hearing, when the court asked the respective parties for evidence in aggravation/mitigation of punishment, the prosecutor responded that the state had none. Parrott's lawyer called to the stand Parrott's grandfather, who testified

---

[26] *Baugh v. State*, 293 Ga. 52, 54 (2) (743 SE2d 407) (2013) (citations omitted).

[27] See further Division 3 (b), supra.

[28] See generally *Gaither v. Cannida*, 258 Ga. 557, 558-559 (2) (372 SE2d 429) (1988) (analyzing, within the context of an appeal from the grant of habeas corpus, that "the standards set forth in *Strickland*, supra, . . . technically may not apply" to the sentencing phase on a non-death-penalty case, then reasoning that the standards can "be employed in a case such as the present one, in which there is a range in the possible sentences to be imposed, hence a corresponding duty on counsel to seek whatever mitigation in sentencing may be reasonably available and appropriate").

that Parrott's father had died, and that he had taken care of Parrott since 2003. Parrott's grandfather summarized that "[Parrott] never had a shake or nothing" and asked the court for leniency in sentencing. Parrott's lawyer then reminded the court that Parrott "was 16 years old at the time of the crime and only an eighth grade education"; further, Parrott's lawyer asked the court to "show some mercy on [Parrott] based on his age and the facts and circumstances of the case as you heard them."

> The appropriate test for whether [Parrott's] counsel was deficient is whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted . . . . We understand that post-conviction counsel will almost always be able to identify some potential mitigating evidence not presented . . . and that this alone does not render trial counsel's performance deficient.[29]

Decisions about which witnesses to call, if any, and when to call them are matters of strategy and thus "do not amount to deficient performance unless they are so

---

[29] *Head v. Carr*, 273 Ga. 613, 625 (4) (C) (3) (544 SE2d 409) (2001) (citations and punctuation omitted); see *Zant v. Moon*, 264 Ga. 93, 97-98 (2) (440 SE2d 657) (1994) (reiterating that, "in considering ineffective assistance of counsel claims, '[reviewing courts] address not what is prudent or appropriate, but only what is constitutionally compelled'"), quoting *Burger v. Kemp*, 483 U. S. 776, 794 (IV) (107 SCt 3114, 97 LE2d 638) (1987).

19

unreasonable that no competent attorney would have made them under similar circumstances."[30] Moreover, "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[31]

Here, at the post-conviction hearing,[32] the trial court heard the evidence that Parrott claims should have been introduced in mitigation, yet summarily ruled that it presented no basis for concluding that trial counsel was ineffective. Parrott has failed to demonstrate that, in so ruling, the trial court committed reversible error.[33]

---

[30] *Miller v. State*, 296 Ga. 9, 12 (4) (a) (764 SE2d 823) (2014) (citations and punctuation omitted).

[31] *Wright v. State*, 285 Ga. 428, 435 (6) (a) (677 SE2d 82) (2009) (citation omitted).

[32] As noted above, during post-conviction proceedings, the trial court vacated an initial sentence on the aggravated assault charge, merging that offense into the voluntary manslaughter for purposes of sentencing. Parrott makes no contention that the sentences thus imposed (for voluntary manslaughter and possession of a firearm during the commission of a crime) fell outside their respective statutory limits.

[33] See *Baines v. State*, 201 Ga. App. 354, 355 (411 SE2d 95) (1991); see also *Zant*, supra at 97-98 (2) (determining that petitioner failed to show a reasonable probability that, if adduced at the sentencing phase of the trial, psychiatric and background evidence presented in the habeas hearing would have resulted in a lighter sentence, where such evidence did "not paint an entirely sympathetic picture of

*Judgment affirmed. Ellington, P. J., and McMillian, J., concur.*

---

[petitioner],"but showed he had been "in trouble as a juvenile," and where evidence allowed for finding that "he was even more dangerous than the ordinary criminal"); *Hance v. Kemp*, 258 Ga. 649, 658 (2) (d) (373 SE2d 184) (1988) (determining that petitioner failed to establish requisite prejudice for failing to adduce as mitigation evidence the testimony of a psychologist, whose testimony "may have offered a plausible contributing factor (mental and physical abuse inflicted upon him and his sister by his stepfather) for [petitioner's] personality disorder, but [the psychologist's] descriptions of [petitioner's] 'marked paranoia,' 'homicidal ideation,' aggressiveness and 'hostility' would have given the prosecutor further grounds to argue [petitioner's] dangerousness"); *Mallon v. State*, 266 Ga. App. 394, 397-398 (3) (597 SE2d 497) (2004); *Conklin v. Schofield*, 366 F3d 1191, 1204 (III) (B) (11th Cir. 2004) ("[C]ounsel need not present all available mitigating circumstance evidence in order for counsel's conduct to be deemed effective at the sentencing stage. Indeed, the [United States] Supreme Court and this Court in a number of cases have held counsel's performance to be constitutionally sufficient *when no mitigating circumstance evidence at all was introduced, even though such evidence. . . was available*.") (citation and punctuation omitted; emphasis in original).