**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: March 7, 2023

S22A1116.  MONROE v. THE STATE.

COLVIN, Justice.

Steven Monroe appeals his convictions for malice murder and related offenses arising out of the 2014 shooting death of Clayton Cross and aggravated assaults of Kenneth Minson ("Kenneth"), Darius Minson ("Darius"), Willie Calhoun, Muhammad Clark, Dominique Ellis, and Craig Harris.[1]  On appeal, Monroe claims that

---

[1] On September 21, 2015, a Clinch County grand jury jointly charged Monroe, Trevor Posley, and Dexter Freeney on a 48-count indictment for crimes committed against Cross, Kenneth, Darius, Calhoun, Clark, Ellis, and Harris.  Specifically, the jury charged the defendants with the malice murder of Cross (Count 1); the felony murder of Cross predicated on aggravated assault (Count 2); the aggravated assaults of Cross, Kenneth, Darius, Calhoun, Clark, Ellis, and Harris (Counts 4, 10, 12, 14, 16, 18, and 20); possessing a firearm during the commission of a felony (Counts 3, 5, 11, 13, 15, 17, 19, and 21); and violating the Georgia Gang Act (Counts 6 through 9, and 22 through 42).  Posley was indicted on an additional two counts of violating the Georgia Gang Act (Counts 43 and 44), and Monroe was indicted on an additional three Gang Act violations (Counts 46 through 48) and for possessing a firearm as a convicted felon (Count 45).

Freeney pled guilty prior to trial and testified as a witness for the State.

the evidence was insufficient to support his convictions for violating Georgia's Gang Act and his convictions on all counts related to Clark. Monroe further alleges that the trial court abused its discretion by denying his motion for mistrial based upon alleged juror misconduct, erred by failing to charge the jury on self-defense, improperly admitted opinion evidence at trial, and erred during sentencing. Finally, Monroe alleges that he received ineffective assistance of counsel. For the reasons that follow, we affirm Monroe's convictions. However, because the trial court committed

Monroe and Posley were jointly tried from June 13 through 16, 2016. The jury acquitted Posley on all counts and acquitted Monroe on four of the Gang Act charges (Counts 36, 37, 40, and 41). Monroe was found guilty of all remaining counts. He was sentenced to life in prison for malice murder (Count 1), five years in prison consecutive for possession of a firearm during the commission of a crime (Count 3), ten years in prison concurrent for each violation of the Georgia Gang Act (Counts 6, 7, 22 through 35, 38, 39, 42, and 46 through 48), twenty years in prison consecutive for each count of aggravated assault (Counts 10, 12, 14, 16, 18, and 20), ten years in prison consecutive for each count of possession of a firearm during the commission of a crime (Counts 11, 13, 15, 17, 19, and 21), and five years in prison consecutive for possession of a firearm by a convicted felon (Count 45). Counts 2, 4, 5, 8, and 9 were merged or vacated by operation of law. In total, Monroe received a sentence of life plus 190 years in confinement. Monroe timely filed a motion for new trial on June 21, 2016, which was amended through new counsel on January 24, 2022. The trial court denied the motion as amended on March 28, 2022. The case was docketed to this Court's August 2022 term and submitted for a decision on the briefs.

2

sentencing errors, we vacate the sentences for Counts 11, 13, 15, 17, 19, 21, 47, and 48, and remand this case to the trial court with direction to correct the sentencing errors.

1. Monroe contends that the trial court erred by failing to grant his motion for a directed verdict on all Georgia Gang Act charges (Counts 6, 7, 22 through 35, 38, 39, 42, and 46 through 48) because the evidence failed to show that the commission of the crimes furthered the interests of the gang. In order to show a violation of the Georgia Gang Act, the State must establish:

> (1) the existence of a "criminal street gang," defined in OCGA § 16-15-3 (2) as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"; (2) the defendant's "association with the gang"; (3) that the defendant "committed one of the offenses identified in OCGA § 16-15-3 (1)"; and (4) "that the crime was intended to further the interests of the gang."

*Boyd v. State,* 306 Ga. 204, 209 (1) (a) (830 SE2d 160) (2019) (citations omitted). As to the fourth prong, "[t]his element requires some nexus between the act and the intent to further street gang activity." *Butler v. State,* 310 Ga. 892, 896-897 (1) (b) (855 SE2d 551)

3

(2021) (citation omitted).

"The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction." *Smith v. State*, 304 Ga. 752, 754 (822 SE2d 220) (2018) (citation and punctuation omitted). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Frazier v. State*, 308 Ga. 450, 452-453 (2) (a) (841 SE2d 692) (2020) (citation and punctuation omitted). When evaluating the sufficiency of the evidence as a matter of constitutional due process, we must determine whether, viewing the evidence in the light most favorable to the verdict, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis omitted).

Viewed in this light, we cannot say that the trial court erred in denying Monroe's motion for a directed verdict. The evidence

4

presented at trial showed that, at all relevant times, Monroe was in a leadership position of the "Hoover" gang, a subset of the Crips, a criminal street gang based in Homerville, Georgia. Monroe's co-defendants, Dexter Freeney and Trevor Posley were also members of the Crips, but they were in different subsets of the Crips.

On May 8, 2014, Monroe was driving in a car with his father, Otis, when Monroe rear-ended another car in which Kenneth, a member of the Bloods criminal street gang, was a passenger. Freeney, who was near the accident scene, saw Monroe approach the driver of the other car with his insurance card. As the two interacted, Kenneth was standing nearby holding a gun behind his leg. Monroe later told Freeney that he felt disrespected by Kenneth and that he "wanted [Kenneth] dead for having the gun." Freeney testified that a car wreck between members of the Bloods and the Crips would be "the beginning of World War II."

On May 10, 2014, Freeney was outside the 912 Club with Monroe, Posley, and fellow Crips member Donterris Brand. Monroe asked Freeney to see if Kenneth was inside the club. Freeney

testified that fellow Crips members sometimes expect favors of one another. He believed that Monroe would not have asked him to check in the club for Kenneth's presence had Freeney not also been a Crip. Freeney entered the club and saw Kenneth standing at a gambling table. Freeney returned outside to report his findings to Monroe, and the men then went back inside the club.

Monroe approached Kenneth and asked, "Is you good?" Kenneth answered, "Yeah, I'm good," and then Monroe suggested that the two go outside so they could talk. Kenneth testified that he felt cautious as he followed Monroe, thinking that something might happen because he "had already got word that something might go on . . . [and] to be careful." Monroe stated that he wanted to "clear the air" concerning the car accident earlier in the week and, Kenneth testified, Monroe continued to talk about the wreck in order to distract Kenneth. During their brief conversation, Posley approached from around the corner with his hand under his shirt. Posley and Monroe both brandished guns and started shooting. Kenneth testified that, as he ran away from the gunshots, he

removed a gun from his pocket and returned fire. Kenneth ran back into the club where he was met with more gunfire from Freeney.

Darius, Calhoun, Clark, Ellis, Harris, and Cross were playing cards at a table near the back door of the club when the shooting started. Darius, Calhoun, Ellis, and Harris, in addition to other witnesses, testified that, as soon as they heard shots, the crowd inside the club became chaotic, "like roaches scatter when you spray Raid." Everyone inside the club tried to run and hide from the gunfire. Freeney testified that he saw Monroe's arm, which he identified by a distinctive gang tattoo, shooting a black .38 Special revolver into the club through the back door. Other witnesses testified that they saw Monroe with a gun that night and they saw him shooting into the club from the back door. After the shooting stopped, Kenneth found Cross lying in a pool of blood on the floor. He had suffered a single gunshot wound to the head.

Monroe fled the scene immediately after the shooting. Freeney fled the scene in a car with Posley, Posley's brother, and Donterris Brand. The group drove to Freeney's cousin's house where they

7

locked Freeney's Colt .357 and Posley's .40-caliber gun in a gun safe. Posley told Freeney not to say anything about what happened at the club. After the shooting, Posley talked about how "snitches" need to die, and Monroe threatened Freeney multiple times not to testify. Kenneth left the scene and threw his gun, a Lorcin .380 semi-automatic pistol, into a pond. His gun was later recovered and sent to the GBI for testing.

During their investigation into the shooting, law enforcement officers collected numerous bullets and shell casings at the scene. They also located several bullet defects on the rear exterior portion of the building and on the back porch, indicating that several of the shots fired originated from outside of the club. During Cross's autopsy, the medical examiner retrieved one .38-caliber bullet from Cross's skull.

A GBI firearms expert testified that she received "a number of different . . . cartridge cases," ".380 metal jacketed bullets and a .380 metal jacket," and "seven .38 lead round bullets," including the one from Cross's autopsy, to examine. The firearms examiner opined

8

that the .380 bullets and metal jacket were fired from Kenneth's gun. She further concluded that the bullet that killed Cross was not fired from Kenneth's weapon. She opined that three of the .38-caliber bullets that had been located inside the club, and the .38-caliber bullet that had killed Cross, "were consistent with being fired from the same types of firearms, that being Astra and Rossi .357 Magnum revolvers and .38 Special revolvers, and also Taurus, Iver Johnson and Charter Arms .38 Special revolvers." She further opined that three of the .38-caliber bullets recovered from inside the club were consistent with being fired from a different weapon, either a Colt .357 Magnum or .38 Special revolver.

Monroe contends that, though the evidence showed that the defendants were gang members, the State failed to prove that the shootings were committed with an intent to further the interests of the gang. Specifically, Monroe argues that the evidence failed to establish that he and his co-defendants planned to commit the shootings and that the incident was related to their gang. However, as discussed above, the evidence presented at trial showed that

9

Monroe, a high-ranking member of the Crips, sought to avenge the perceived disrespectful behavior of Kenneth, a rival Bloods gang member, after the two were in a car accident. Monroe enlisted Freeney and Polsey, fellow Crips, to help execute that plan and directed his co-defendants on what actions to take. See *Rodriguez v. State*, 284 Ga. 803, 807 (1) (671 SE2d 497) (2009) ("Management of or participation with others in that criminal street gang activity necessarily implies knowledge of the gang's criminal activities and a specific intent to further its criminal purposes."). After the shooting, the group took steps to conceal their weapons, and Monroe threatened others not to talk to the police or testify against him a trial. See *Butler*, 310 Ga. at 897 (1) (b) ("[D]iscussions between fellow gang members after the charged crimes, which may include attempts to avoid getting caught, may offer further evidence of a nexus between the crimes and the gang's interests."). Because the evidence was sufficient to establish a nexus between the charged crimes and an intent to further the gang's interests, the trial court did not err in denying Monroe's motion for a directed verdict on the

10

Gang Act counts.

Monroe further contends that the trial court erred "in not directing a verdict" and in entering convictions and sentences for the counts related to the aggravated assault and weapon charge concerning Clark[2] because Clark did not testify at trial and, therefore, there was insufficient evidence to support these convictions. We disagree. "The testimony of a single witness is generally sufficient to establish a fact." OCGA § 24-14-8. Here, numerous witnesses testified at trial that Clark was inside the club playing cards when the shooting occurred. Witnesses also testified that everyone inside the club, including Clark, ran and hid as soon as the shooting started. This evidence was sufficient to establish that Clark was placed in reasonable apprehension of immediately receiving a violent injury, and thus supported the aggravated assault and firearm charges. See OCGA § 16-5-20 (a) (2) (defining

---

[2] In addition to the two Gang Act charges naming Clark as a victim (Counts 28 and 29), the indictment charged Monroe for the aggravated assault of Clark (Count 16) and for possessing a firearm during the commission of the aggravated assault of Clark (Count 17).

11

simple assault); OCGA § 16-5-21 (a) (2) (defining aggravated assault); *Howard v. State*, 288 Ga. 741, 742 (1) (707 SE2d 80) (2011) ("Testimony that the victims ran from the gunfire is sufficient evidence that Appellants placed them in reasonable apprehension of immediately receiving a violent injury.").

2. Next, Monroe contends that the trial court abused its discretion when it denied his motion for a mistrial based upon alleged juror misconduct. The record shows that, prior to the beginning of deliberations, the trial court instructed the jury that, among other things, they were not allowed to use an electronic device during deliberations to communicate with anyone, and they were not allowed to go onto any social media websites "to communicate with anyone any information about this case, or to conduct any research about this case until [the court] accept[s the] verdict."

The jury started deliberating at 9:00 a.m., on June 16. They broke for lunch at approximately 12:15 p.m. and, upon their return an hour later, B.T., a juror, reported an incident to the trial court.

12

The trial court questioned B.T. as follows:

COURT: At [lunch] you had come back and indicated that somebody had made contact with your wife; is that right?

B.T.: Right.

COURT: Would you please – let me get this where everybody can hear you. Would you please state what you indicated or what you understand that occurred?

B.T.: Some black guy came in my wife's store and said there was going to be trouble here today.

COURT: And where was this store?

B.T.: Behind the Subway.

COURT: Do you have any idea whether the fellow that came in knew that the lady there was your wife or not?

B.T.: No, sir.

COURT: He just came in and made a statement?

B.T.: Yes, sir.

COURT: And did your wife tell you that?

B.T.: Yes, sir.

COURT: Did she call you and talk to you? How did y'all communicate?

B.T.: I go over there for lunch.

COURT: Okay. And she told you that a black fellow came in and said what? After the case there's going to be trouble, or what actually you understand was said?

B.T.: What I understood, it was when the verdict was read, that's when the trouble is.

COURT: Okay. Have you given this information to any other jurors?

13

| | |
|---|---|
| B.T.: | [shakes head negatively]. |
| COURT: | Did any other jurors hear the statement? Has anybody heard anything about that statement that your wife made to you? |
| B.T.: | I don't think so, sir. |
| COURT: | You didn't tell anybody? |
| B.T.: | No. |
| COURT: | Okay. Has this statement scared you or got you concerned? |
| B.T.: | A little bit. |
| COURT: | Okay. Do you feel like you are no longer able to serve as a juror or can you continue serving as a juror? What's your – |
| B.T.: | I'd like to continue on. |

Thereafter, the trial court individually polled the jury regarding what jurors might have heard and what, if any, effect that might have had on their ability to be impartial.

Juror P.H. stated that B.T. walked up to her and another juror and stated that "his wife came up to him and said somebody come into the store and said that they was going to get somebody." She indicated that the comment by B.T. did not in any way affect her ability to be a fair and impartial juror in the case.

Juror B.H. stated that she heard bits of a statement made by B.T. She explained "[a]ll I heard was that his wife was upset

because somebody come in the store and said that Freeney got beat up." She confirmed that P.H. was with her when B.T. made that statement. She also affirmed that the statements would not affect her ability to be a fair and impartial juror in the case.

Juror L.N. stated that, when the jurors came back from lunch, B.T. "said that he felt like he should tell us what he had heard while he was at lunch." L.N. stated, "I told him I was not interested in hearing any information. I told him to speak to the sheriff or Deputy Sheriff Raymond Peterson. One of the ladies while we were in the bathroom was discussing that she had heard there was going to be trouble when this was over with." L.N. confirmed that this female juror had already been questioned by the court regarding this issue. L.N. also confirmed that nothing she heard would impair her ability to sit as a fair and impartial juror in the case.

Juror K.P. testified that she heard B.T. "talking about something they had heard from the outside," but she "didn't hear exactly" what he had said. She testified that she "walked off and told [L.N.] to let's hurry and get on inside," and that the "only thing

I did hear was about the Defendant that had already been sent to jail."[3] She affirmed that nothing she heard would impair her ability to sit as a fair and impartial juror.

Juror J.S. stated that he did not hear anything about the case from anyone or any other juror, but he admitted that he saw a post on Facebook that "if we didn't plead both of them guilty, one of them was going to die on the stand." When questioned he stated that he did not mention what he saw on Facebook to anyone else on the jury.

Juror T.J. indicated that he had heard from his wife that someone had posted something about the case on Facebook. Specifically, he heard that "if somebody got away, they was going to kill them." He testified that the post did not indicate who would be killed or who had made the post. T.J. stated that this information would not prevent him from being a fair and impartial juror on the case.

Juror K.G. stated "the only thing I've heard is when I went to lunch I heard that people were putting stuff up on Facebook." K.G.

---

[3] It appears that K.P. was referring to Freeney.

16

testified that he had not seen any of the postings, and further affirmed that he did not hear anything during the lunch hour that would have affected his ability to be fair and impartial.

Jurors T.S., R.M. L.G., and D.R., and alternate jurors C.G, J.S., and W.D. had not heard anything related to the case during lunch.

After the jury was polled, the following occurred:

| | |
|---|---|
| COURT: | All right. I'm going to remove [J.S.] who went on Facebook in violation of Court order. And I'll – well, I'll proceed on that issue later. I'm going to replace him with the first alternate, [C.G.]. Now, any objections from anyone? |
| POSLEY: | None from Posley. |
| STATE: | Not from the State, Your Honor. |
| MONROE: | I don't have any objections to [J.S.] being removed, but I'd also ask that [B.T., K.G., P.H., T.J., and B.H.] be removed. [B.T.], his wife has been threatened, and I really don't think that he can be an impartial juror, no matter what he says. And he got up here on the stand and lied to say that he didn't talk to – talk to anybody else about this, and then we had [P.H. and B.H.] come in and say that he had spoke [sic] with them about it. And [L.N.] said he attempted to speak with her, and [K.P.], and they walked away. [B.H.], okay, stated that she heard that Freeney was beaten up, so while she states that |

17

she can't be – I mean, that she can be an impartial witness, I don't – I mean, juror, I don't know about that. And [T.J.] speaking with his wife about what was on Facebook, about somebody not making it out of here. I don't think any of those six jurors should remain on the jury, and with us only having three alternates, I would move for a mistrial.

POSLEY: Posley joins in that motion. Especially [B.T.] because I think he did not – was not truthful with the Court.

COURT: All right.

POSLEY: And I think he's really living in fear now, afraid not to convict both of these defendants.

COURT: All right. I'm going to deny your motion for mistrial. I'm going to replace [B.T.] with the next juror in line, [J.S.]. All right.

The trial court then removed B.T. and J.S., replaced them with alternates, and instructed the jury to start deliberations from the beginning since two new jurors had been placed on the panel. The jury resumed deliberating at 2:21 p.m. Five hours later, the jury reached a verdict acquitting Posley of all charges and acquitting Monroe of four charges but finding him guilty of all remaining counts.

18

Monroe claims that the trial court abused its discretion by failing to order a mistrial upon discovering that (1) B.T. had received extra-judicial information that there would be "trouble" when the court read the verdict and had shared that information with other jurors, and (2) J.S. had received extra-judicial information that an acquittal might result in one of the defendants being killed. We disagree.

We review a trial court's denial of a motion for mistrial for abuse of discretion, "and the trial court's exercise of [its] discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Mitchell v. State*, __ Ga. __, __ (2) (__ SE2d __) (2022) (citation and punctuation omitted). "To set aside a jury verdict solely because of irregular jury conduct, a court must conclude that the conduct was so prejudicial that the verdict is inherently lacking in due process." *Harris v. State*, 314 Ga. 51, 53 (2) (875 SE2d 649) (2022) (citation and punctuation omitted). "Any juror [irregularity] that has the potential to injure a defendant's due process rights triggers [a] presumption of

prejudice," and "the prosecution [must then carry] the burden of establishing beyond a reasonable doubt that no harm occurred." Id. at 53-54 (2) (citations and punctuation omitted). It is well settled that

> the type of irregularity that gives rise to such a presumption of prejudice involves juror misconduct that has the potential to injure a defendant's due process rights, e.g., making an unauthorized visit to the crime scene and then presenting the findings to the jury panel; privately discussing the defendant's guilt prior to deliberations in violation of the court's instructions; or improperly accessing outside news sources.

*Dixon v. State*, 302 Ga. 691, 695 (3) (a) (808 SE2d 696) (2017) (citation omitted). "To establish that the juror [irregularity] was harmless beyond a reasonable doubt, the State must show based on the record evidence that there is no reasonable possibility that the juror [irregularity] contributed to the conviction." Id. at 54 (2) (citation and punctuation omitted).

Here, because the State showed that the irregularities were harmless beyond a reasonable doubt, the trial court did not abuse its discretion by denying Monroe's motion for a mistrial based upon

20

alleged juror misconduct. Although J.S. improperly accessed social media in violation of the trial court's instruction, the record authorized the trial court to conclude that he did not share what he found with other jurors. Further, the court removed any potential for harm by dismissing him from the jury once it discovered that he had disregarded the court's instructions not to access social media. Accordingly, the trial court was authorized to conclude that J.S.'s misconduct was harmless beyond a reasonable doubt. See *Dixon*, 302 Ga. at 695 (juror irregularity harmless beyond a reasonable doubt where there was no evidence juror shared any impermissible information with other jurors and where juror was dismissed after her actions came to light).

Turning to B.T., the record shows that he obtained information about the case from his wife and shared that information with other members of the jury. Assuming for the sake of argument that this is the type of conduct that would trigger a presumption of prejudice, see *Dixon*, 302 Ga. at 695, the trial court was authorized to find that the juror's actions did not impact any other juror's assessment of the

21

charges against Monroe. The information obtained and shared by B.T. – that there would be "trouble" when the court read the verdict – did not indicate that any particular verdict (guilty or not guilty) would trigger "trouble," nor did it indicate what kind of "trouble" might occur or who might be harmed. Moreover, the other jurors who talked to B.T. (P.H. and B.H.) stated that the information they heard would not affect their ability to remain fair and impartial,[4] and the record supports the conclusion that the information in fact did not cause the jury to return any particular verdict.[5]

Because "no evidence was presented that the juror's conduct

---

[4] K.P. testified she did not hear what B.T. said, and L.N. testified that she refused to listen to B.T. and told him to report any information to the sheriff. L.N. did overhear a conversation between P.H. and B.H., but she testified that nothing she heard affected her ability to remain fair and impartial.

[5] Although T.J. received more specific information about the potential consequences of an acquittal – that "if somebody got away, [someone] was going to kill them" – the trial court was authorized to find that he did not share that information with any other juror and to determine that the information did not ultimately impact the verdict. See *Burney v. State*, 309 Ga. 273, 294 (5) (845 SE2d 625) (2020). Thus, "no evidence was presented that the juror's conduct contributed to the conviction such that the verdict is inherently lacking in due process." *Hodges v. State*, 302 Ga. 564, 569 (4) (807 SE2d 856) (2017) (citations omitted).

22

contributed to the conviction such that the verdict is inherently lacking in due process," *Hodges v. State*, 302 Ga. 564, 569 (4) (807 SE2d 856) (2017) (citations omitted), the trial court was authorized to conclude that the State had carried its burden in establishing beyond a reasonable doubt that B.T.'s alleged misconduct was harmless. Consequently, the trial court did not abuse its discretion by denying Monroe's motion for a mistrial based upon alleged juror misconduct.[6]

3. Monroe claims that the trial court erred by failing to instruct the jury on self-defense. Monroe, however, did not request a jury charge on self-defense. Because he raises this issue for the first time on appeal, this claim can be reviewed only for plain error. See *Williams v. State*, 302 Ga. 147, 151-152 (2) (805 SE2d 873) (2017); *Shaw v. State,* 292 Ga. 871, 872-873 (2) (742 SE2d 707)

---

[6] To the extent that Monroe alleges that the trial court clearly erred by finding that K.G. did not violate the trial court's "no social media" instruction, we disagree. The record shows that K.G. did not access social media, explaining only that he heard during lunch "that people were putting stuff up on Facebook." K.G. testified that he had not seen any of the postings or heard anything during the lunch hour that would have affected his ability to be fair and impartial. Based on the foregoing, we cannot say that that the trial court clearly erred by finding no misconduct on behalf of K.G.

(2013) (jury charge reviewed for plain error where appellant "neither requested a charge on the duty to retreat nor objected when the trial court failed to give such a charge"). In reviewing a failure to charge for plain error, "we will reverse the trial court only if the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Herrington v. State*, 300 Ga. 149, 151 (2) (794 SE2d 145) (2016) (citation and punctuation omitted).

At trial, Monroe elicited the following testimony from Freeney on cross-examination: that, on one occasion, Monroe told Freeney that Kenneth had shot first and Monroe had only returned fire in self-defense; and that Posley had also told Freeney that Kenneth pulled a gun and shot at Monroe first, and Monroe had merely returned fire. Based upon Freeney's testimony, we agree with Monroe that there was slight evidence to support a self-defense charge. See *Leeks v. State*, 303 Ga. 104, 107 (2) (810 SE2d 536) (2018) ("A trial court is authorized to give a requested jury

24

instruction if there was produced at trial slight evidence supporting the theory of the jury charge." (citation omitted)).  Moreover, there is nothing in the record showing that Monroe affirmatively waived the challenged charge.  However, given the strength of the evidence of Monroe's guilt as discussed in Division 1, we cannot say that Monroe has made an affirmative showing that the trial court's failure to give the charge likely affected the outcome of his trial.  Accordingly, there is no plain error.  See *Munn v. State*, 313 Ga. 716, 723 (3) (873 SE2d 166) (2022) (even assuming that there was slight evidence to support a jury charge on self-defense, there was no plain error where the evidence supporting the charge was self-serving and weak compared to the overwhelming evidence of defendant's guilt); *Jones v. State*, 310 Ga. 886, 889 (2) (855 SE2d 573) (2021) (harmless error to fail to charge jury on defense of self or third person because "to the extent there was any evidence supporting a charge on defense of self or a third person, it was meager at best").

4.     Monroe alleges that the trial court erred by admitting the improper lay opinion testimony of Special Agent Klay Luke at trial.

25

During the direct examination of Agent Luke, the State asked him to describe his role as the lead investigator, which included questions concerning witness interviews and evidence collection. At one point, the following exchange occurred:

> STATE: …Is it safe to say there was over a hundred and fifty exhibit numbers indicating that's a hundred and fifty different people you interviewed, pieces of evidence you touched or some kind of documentation that you conducted -- documentation investigation you conducted regarding this case?
>
> LUKE: That is correct.
>
> STATE: Regarding the murder of Clay Cross?
>
> LUKE: That is correct.
>
> STATE: All right. There are several people that you interviewed that did not agree to come testify; is that correct?
>
> LUKE: That is correct.
>
> STATE: During your interview process, did everyone cooperate fully?
>
> LUKE: No, they did not.
>
> STATE: And what did you surmise from that lack of cooperation as the case agent, as the investigator of this murder of Clay Cross?
>
> LUKE: They're in fear.

Co-defendant Posley objected to the agent's testimony, and Monroe joined the objection. The prosecutor responded, "[T]his is the case

26

agent. It's his investigation and he had to draw conclusions from his investigation and that's what I'm asking him." The trial court overruled the objection, stating that the agent was allowed to "give his opinion based on his investigation and his discussions with these people." Thereafter, the prosecutor moved onto another topic.

Monroe alleges that the trial court erred by allowing Agent Luke to give opinion testimony because it did not meet the requirements of OCGA § 24-7-701 (a)[7] of the Evidence Code. Assuming without deciding that the admission of this evidence was erroneous, any error was harmless. "In determining whether [an evidentiary] error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." *Timmons v. State*, 302 Ga. 464, 470 (2) (b) (807 SE2d 363) (2017) (citation and punctuation omitted). "The test for determining

_____

[7] OCGA § 24-7-701 (a) states that lay witness opinion testimony

shall be limited to those opinions or inferences which are:
(1) Rationally based on the perception of the witness;
(2) Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and
(3) Not based on scientific, technical, or other specialized knowledge within the scope of Code Section 24-7-702.

27

nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." Id. (citation omitted).

Here, the jury had already heard testimony that Posley and Monroe had threatened witnesses not to talk to or cooperate with law enforcement officers. Further, the evidence against Monroe was strong, and the exchange between Agent Luke and the prosecutor was brief. Based on the foregoing, it is highly probable that any error did not contribute to the verdict. See *Tuggle v. State*, 305 Ga. 624, 627 (2) (825 SE2d 221) (2019) (any error in the admission of evidence was harmless where testimony was cumulative of other evidence already admitted and where there was strong evidence of guilt); *Soto v. State*, 303 Ga. 517, 524 (3) (813 SE2d 343) (2018) (holding that any error in admitting evidence was harmless where the evidence against the defendant was strong, and the reference to the evidence was brief).

5. Monroe alleges that the trial court erred when it sent the autopsy report back with the jury in violation of the so-called

28

"continuing witness rule."[8]  Monroe contends that allowing the autopsy report in the jury room during deliberations placed an undue emphasis on the report over the oral testimony of the medical examiner from the witness stand.  However, this issue is not preserved for appellate review.

During the State's case-in-chief, the State called the medical examiner, Dr. Maryanne Gaffney-Kraft, to testify regarding her findings from Cross's autopsy.  When the State tendered the autopsy report into evidence, Posley lodged an objection under the continuing witness rule and argued that it not be allowed to go back

---

[8] As we have previously explained:

In Georgia, the continuing witness objection is based on the notion that written testimony is heard by the jury when read from the witness stand just as oral testimony is heard when given from the witness stand. But, it is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once. The types of documents that have been held subject to the rule include affidavits, depositions, written confessions, statements, and dying declarations.

*Rainwater v. State*, 300 Ga. 800, 803 (2) (797 SE2d 889) (2017) (citation omitted).

with the jury. Monroe joined the objection. The State responded, "[I]t is the actual findings of the autopsy, and we are submitting it as such for the jury's review." The trial court "note[d] the objection" and admitted the report into evidence. The record shows no additional discussion, objection, or ruling by the trial court on this issue, and the record does not reflect whether the autopsy report went out with the jury during deliberations. Because there is nothing in the record indicating that the autopsy report was given to the jury during deliberations, this claim fails. See *McFarlane v. McFarlane*, 298 Ga. 361, 362 (4) (782 SE2d 29) (2016) (explaining that the burden is on the appellant to show error affirmatively by the record). See also *Parrott v. State*, 330 Ga. App. 801, 803 (1) (769 SE2d 549) (2015) ("It is well settled that the burden is on the appellant 'who asserts error to show it affirmatively by the record.'" (citing *Griffin v. State*, 265 Ga. 552, 555 (10) (458 SE2d 813) (1995), and quoting *Roach v. State*, 221 Ga. 783, 786 (4) (147 SE2d 299) (1966))); *Smart v. State*, 253 Ga. App. 649, 653 (5) (560 SE2d 92) (2002) ("The burden is on appellant to show error affirmatively from

30

the record, and we will not presume error where the record is silent.").[9]

6. Next, Monroe alleges that he received ineffective assistance of counsel when trial counsel failed to: (a) request a jury charge on self-defense, (b) conduct a pre-trial investigation into the criminal histories of all of the State's witnesses and discover any deals that Kenneth and Freeney may have obtained in exchange for their testimony, and (c) properly impeach Kenneth and Freeney with their prior criminal histories and potential deals in exchange for their testimony.

In order to establish constitutionally ineffective assistance, a defendant must show that his counsel's performance was professionally deficient and that, but for such deficient performance,

---

[9] Monroe also argues that the trial court failed to adequately advise him of his appellate and habeas rights and asks this Court to remand his case to the trial court so it can "appropriate[ly] advis[e]" Monroe of his post-conviction rights. However, the record shows that, at the conclusion of Monroe's sentencing hearing, the trial court advised Monroe that he had the right to file for habeas corpus relief and that he had the right to appeal this case to the Supreme Court or Court of Appeals within 30 days from that date. The trial court also advised Monroe that if he had any questions regarding these rights that he could ask his attorney. Thereafter, Monroe timely exercised his right to a direct appeal.

31

there is a reasonable probability that the result of the trial would have been different. See *Strickland v. Washington*, 466 U. S. 668 (III) (104 SCt 2052, 80 LE2d 674) (1984). If the defendant fails to satisfy either prong of the *Strickland* test, this Court is not required to examine the other. See *Green v. State*, 291 Ga. 579, 580 (2) (731 SE2d 359) (2012).

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (IV) (131 SCt 770, 178 LE2d 624) (2011) (citation omitted). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688 (III).

"In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012) (citation and punctuation omitted). With these principles in mind,

32

we review Monroe's claims of ineffective assistance.

(a) *Jury Charge*

Monroe alleges that trial counsel was ineffective for failing to request a jury charge on self-defense where there was slight evidence to support such a charge. However, for the reasons discussed in Division 3, supra, Monroe cannot show prejudice under *Strickland*. See *Jackson v. State*, 306 Ga. 69, 84 (4) (b) (829 SE2d 142) (2019) ("This Court has equated the prejudice step of the plain error standard with the prejudice prong for an ineffective assistance of counsel claim." (citation and punctuation omitted)). Accordingly, this claim fails.

(b) *Trial Preparation*

Monroe claims that trial counsel was ineffective for failing to fully investigate the prior criminal histories of all of the State's witnesses. At the motion for new trial hearing, trial counsel explained that "there were more than one hundred witness names given to me," and she had no recollection "if we ran histories on them or not." However, counsel explained that she was familiar with

33

many of the State's witnesses because her office had previously represented them on their own criminal matters. Counsel also testified that the District Attorney's office had an open file policy and that she personally copied the State's file to make sure no papers were missed.

Insofar as Monroe claims that counsel was deficient for failing to investigate the criminal histories of Freeney and Brand, this claim fails. Counsel testified that, prior to trial, she learned the details of Freeney's guilty plea agreement and sentence. Counsel was also aware that, at the time of trial, Freeney and Brand both had pending Gang Act charges.[10] Based on the foregoing, Monroe has failed to "show that counsel's representation fell below an objective standard of reasonableness" regarding counsel's investigation into the criminal histories of Freeney and Brand. *Strickland*, 466 U.S. at 688 (III) (A).

---

[10] At the motion for new trial hearing, Monroe introduced the certified copies of the convictions for Freeney and Brand on these charges. However, as explained by trial counsel, those charges were in pending status at the time of Monroe's trial.

Monroe has also failed to show deficient performance for trial counsel's alleged failure to investigate the criminal histories of all of the State's witnesses. The record shows that the State called 22 witnesses during its case-in-chief. At the motion for new trial hearing, Monroe introduced the convictions of two witnesses, Darryl Thomas and Bobby Joe Clark. But Clark was not called as a witness at trial, and therefore could not have been impeached with a prior conviction. Thomas's prior convictions were for misdemeanor violations of Georgia's alcohol sale and licensing statute, which would not have been admissible as impeachment evidence. See OCGA § 24-6-609 (a) (a witness may be impeached by a prior conviction where crime was punishable by imprisonment "in excess of one year" or where the elements of the crime "required proof or admission of an act of dishonesty or making a false statement"). Therefore, Monroe has failed to show how counsel was deficient for allegedly failing to conduct this additional investigation.

As to the remainder of the State's witnesses, Monroe did not introduce any evidence to show what counsel might have uncovered

35

had she investigated their criminal histories further. Without that evidence, his claim of deficient performance fails as to those witnesses as well. See *Martin v. State*, 276 Ga. 121, 122 (2) (575 SE2d 498) (2003) ("Because the defendant has not presented any evidence to support his allegation that trial counsel's [actions] fell below a reasonable standard of professional conduct, we conclude that he has not met the standard for proving ineffective assistance of trial counsel."); *Banta v. State,* 282 Ga. 392, 399 (6) (e) (651 SE2d 21) (2007) ("Mere speculation will not support a claim of ineffective assistance of counsel.") Monroe further claims that trial counsel was deficient in her pretrial investigation in that she failed to discover any deal that Freeney and Kenneth were given in exchange for their testimony. As discussed above, the record shows that counsel knew of the deal Freeney was given prior to his testimony and that he was thoroughly cross-examined on this topic. Accordingly, Monroe has failed to show that counsel's investigation was objectively unreasonable and, therefore, has not established deficient performance on this claim with respect to Freeney. See *Martin*, 276

36

Ga. at 122.

Regarding an alleged plea deal for Kenneth, the record shows that, at trial, counsel questioned Kenneth regarding whether he had received a deal in exchange for his testimony, to which Kenneth replied "no." At the motion for new trial hearing, in an attempt to support his claim of ineffective assistance of counsel, Monroe introduced evidence that the arrest warrants taken out against Kenneth in this case were dismissed after the trial, with the explanation that "the State determined he was actually a victim, intended target rather than a suspect," and that the "victim cooperated at trial." Another set of warrants for possession of contraband of an inmate against Kenneth were also dismissed after trial. However, this evidence did not establish that Kenneth had in fact received a deal in exchange for his testimony, and Monroe did not introduce any additional evidence to support his speculation to that effect. Because "[m]ere speculation will not support a claim of ineffective assistance of counsel," *Banta v. State,* 282 Ga. 392, 399 (6) (e) (651 SE2d 21) (2007), Monroe has failed to establish deficient

performance on this claim.[11]

(c) *Impeachment of Witnesses*

Monroe claims that trial counsel was ineffective for failing to properly impeach Kenneth and Freeney with their prior criminal histories and potential deals in exchange for their testimony. Regarding Kenneth, Monroe has failed to put forward any evidence that Kenneth had prior convictions that could be introduced at trial and has also failed to introduce any evidence that he received a deal in exchange for his testimony. Because Monroe has failed to support this claim with any evidence, this claim of ineffective assistance of counsel fails. See *Martin*, 276 Ga. at 122 ("Because the defendant has not presented any evidence to support his allegation that trial counsel's [actions] fell below a reasonable standard of professional conduct, we conclude that he has not met the standard for proving

---

[11] Monroe also summarily argues that the prosecutor committed a discovery violation in that he failed to inform Monroe prior to trial that the State had dismissed charges against Kenneth in exchange for his testimony. However, Monroe makes no further argument in support of this claim, and cites no evidence in the record or case law in support of the same. Accordingly, the argument is deemed abandoned. See Supreme Court Rule 22.

ineffective assistance of trial counsel.").

Concerning Freeney, the record shows that both trial counsel and counsel for Posley conducted lengthy and thorough cross-examinations of Freeney regarding the plea deal he received in exchange for his testimony, his gang affiliations, and his status as a drug dealer. "The scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel." *Brown v. State*, 289 Ga. 259, 263 (4) (b) (710 SE2d 751) (2011) (citation omitted). Monroe provides no argument as to how additional cross-examination of Freeney would have benefitted the defense, nor can we conclude from the record that counsel's cross-examination was deficient. Therefore, Monroe's claim of deficient performance concerning trial counsel's impeachment of Freeney fails.[12] See *Brown*, 289 Ga. at 263 (no deficient performance for

[12] In our analysis we have assumed one deficiency by trial counsel with respect to a claim of ineffective assistance and one trial court error with respect to a jury instruction. Monroe has not sought a cumulative error analysis and, therefore, has not made any specific argument concerning why the effects of the assumed errors have a cumulative prejudicial effect on the outcome of his trial. Nevertheless, we have conducted a cumulative error analysis under

counsel's alleged failure to further cross-examine a witness where the record shows that counsel conducted a thorough cross-examination of that witness, and the defendant made no argument as to how further cross-examination would have benefited the defense).

7.    Monroe raises two claims of trial court error concerning the sentences imposed and the failure to merge certain charges with others.  We will address each in turn.

(a)    *Merger claims*

Monroe alleges that the trial court erred when it failed to merge the Gang Act charges listed in Counts 6, 7, 22 through 33, 46, and 47 with the Gang Act charges listed in Counts 34, 35, 38, 39, and 48 because the crimes in these counts alleged the same conduct, included the same victims, and were proven by the same facts at

---

*State v. Lane*, 308 Ga. 10 (1) (838 SE2d 808) (2020), and "we discern no apparent cumulative prejudice on this record."  *Prickett v. State*, 314 Ga. 435, 445 (3) n.8 (877 SE2d 573) (2022).  See also *Lane*, 308 Ga. at 18 ("[A] defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors.").

trial. Merger is a legal question that we review de novo. See *Price v. State*, 313 Ga. 578, 581 (872 SE2d 275) (2022). For the reasons discussed below, we conclude that, while the trial court erred in sentencing Monroe on Counts 47 and 48 of his indictment, the trial court properly sentenced Monroe on the rest of his Gang Act charges.

Here, Monroe challenges the sentences he received for crimes committed pursuant to two subsections of the Gang Act: OCGA § 16-15-4 subsections (a) and (b). OCGA § 16-15-4 (a) states that "[i]t shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3."[13] Id. OCGA § 16-15-4 (b) makes it illegal "for any person to commit any offense enumerated

---

[13] OCGA § 16-15-3 defines "criminal gang activity" as "the commission, attempted commission, conspiracy to commit, or the solicitation, coercion, or intimidation of another person to commit . . . [a]ny offense defined as racketeering activity by Code Section 16-14-3," OCGA § 16-15-3 (1) (A), and "[a]ny offense defined in Article 4 of Chapter 11 of this title, relating to dangerous instrumentalities and practices," OCGA § 16-15-3 (1) (E). OCGA § 16-14-3 defines murder and aggravated assault as "racketeering activity," see OCGA § 16-14-3 (5) (A) (iv and v), and Article 4 of Chapter 11 of Title 16 includes the offense of possession of a firearm during the commission of a crime, see OCGA § 16-11-106.

in paragraph (1) of Code Section 16-15-3 with the intent to obtain or earn membership or maintain or increase his or her status or position in a criminal street gang." Id. Monroe contends that all of the crimes charged as violations of OCGA § 16-15-4 (a) should have merged as a matter of fact into the crimes charged as violations of OCGA § 16-15-4 (b) pursuant to the required evidence test of *Drinkard v. Walker*, 281 Ga. 211 (636 SE2d 530) (2006).

The State, however, contends that the plain language of OCGA § 16-15-4 (m), which provides that "[a]ny crime committed in violation of this Code section shall be considered a separate offense," shows the legislature's intent to allow for double punishment under the Gang Act statute.[14] We have previously been called upon to interpret subsection (m) of the Gang Act in order to answer the question of whether the statute provides for the merger of a predicate offense into the separate Gang Act count. We concluded that it does not. See *Anthony v. State*, 303 Ga. 399, 404 n.7 (2) (b)

---

[14] Monroe only asserts that the Gang Act crimes should merge under *Drinkard* and does not argue that the crimes should merge under any other theory.

42

(811 SE2d 399) (2018) ("We have also held that OCGA § 16-15-4 (m) allows separate punishment for both participation in criminal gang activity and for the predicate offense through which the participation in gang activity is established."); *Lupoe v. State*, 300 Ga. 233, 239 n.4 (794 SE2d 67) (2016) (noting that the language of subsection (m) "indicat[es] the General Assembly's intent to impose separate punishment for conduct that violates both OCGA § 16-15-4 and another felony statute").[15]

However, the question of whether the language of subsection (m) provides for separate sentences for violations of different subsections of the Gang Act has not been addressed by this Court. It is well settled that "[t]he legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments." *Brown v. Ohio*, 432 U.S. 161, 165 (II) (97 SCt 2221, 53 LE2d 187) (1977). "[T]he Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the

---

[15] For these same reasons, we reject Monroe's claim that the trial court erred by not merging the predicate felonies listed in Counts 10, 12, 13, 16, 18 and 20 into one of the OCGA § 16-15-4 (a) violations.

43

legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (III) (103 SCt 67374, LE2d 535) (1983). See also *Ohio v. Johnson,* 467 U.S. 493, 499 (104 SCt 253, 681 LE2d 425) (1984) ("Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent."). Indeed, "[e]ven if the crimes are the same under *Blockburger*[ *v. United States*, 284 U.S. 299, 304 (52 SCt 180, 76 LE 306) (1932)], if it is evident that the state legislature intended to authorize cumulative punishments, a court's inquiry is at an end." *Johnson*, 467 U.S. at 499 n.8. Accordingly, in order to determine whether the required evidence test of *Drinkard* applies, we must determine if the legislature has provided for double punishments within the relevant section of the Gang Act.

Our analysis turns on the proper interpretation of OCGA § 16-15-4 (m). It is well settled that "[a] statute draws its meaning . . . from its text." *Chan v. Ellis*, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) (citation omitted). When interpreting a statute, we must give

the text its plain and ordinary meaning, view it in the context in which it appears, and read it in its most natural and reasonable way, see *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (751 SE2d 337) (2013), while also giving meaning to all words in the statute, see *Arby's Restaurant Group, Inc. v. McRae*, 292 Ga. 243, 245 (734 SE2d 55) (2012).  When we construe a statute on appeal, our review is de novo. See *Hankla v. Postell*, 293 Ga. 692, 693 (749 SE2d 726) (2013).

OCGA § 16-15-4 (m) states that "[a]ny crime committed in violation of this Code section shall be considered a separate offense." The plain language of this provision evidences the legislature's clear intent to designate certain crimes as "separate offense[s]" subject to separate punishments.  OCGA § 16-15-4 (m).  Those crimes that constitute separate offenses under subsection (m) are specifically "crime[s] committed in violation of *this Code section*."  Id. (emphasis supplied).  Subsection (m) appears within "Code section" 16-15-4.  Thus, subsection (m) indicates that the crimes which should be treated as "separate offense[s]" are those violations of law defined in OCGA § 16-15-4, including, as relevant

45

here, violations of subsections (a) and (b), each of which specify that "[i]t shall be unlawful" for a person to engage in certain conduct. OCGA § 16-15-4 (a), (b). Because the plain language of OCGA § 16-15-4 (m) indicates the legislature's intent to punish as "separate offenses" violations of subsections (a) and (b), charged violations of those subsections cannot merge. See *Nolley v. State*, 335 Ga. App. 539, 545 (2) (782 SE2d 446) (2016) (discussing how the express language of subsection (m) illustrates the legislature's intent "that any crime committed in violation of [the Gang Act] is a separate offense which does not merge with another separate offense under the Code section or with any predicate offense listed in the Code section").

In this case, where Monroe was found guilty of numerous violations of both OCGA § 16-15-4 (a) and (b), the convictions for violating those two subsections do not merge for sentencing purposes.[16] Consequently, Monroe's 15 violations of OCGA § 16-15-

___

[16] Monroe also alleges that the trial court should have merged the OCGA § 16-15-4 violations listed in Counts 22, 24, 26, and 30 through 42 into Count

4 (a) found in Counts 6, 7, 22 through 33, and 46, do not merge into his 6 counts of violating OCGA § 16-15-4 (b) found in Counts 34, 35, 38, 39, 47, and 48.

That said, we agree with Monroe that the trial court erred in sentencing him on two counts. Count 47 charged that Monroe possessed the firearm "with the intent to *maintain* his status," in violation of OCGA § 16-15-4 (b), while Count 48 charged that Monroe possessed the firearm "with the intent to *increase* his status," also in violation of OCGA § 16-15-4 (b). We agree with the Court of Appeals' decision in *Nolley* that there is "no statutory basis to

---

8 for sentencing purposes. To the extent that Monroe alleges that the separate (a) and (b) violations should have merged, we reject that for the reasons set forth above. To the extent that Monroe alleges that the numerous subsection (a) violations should have merged into a single subsection (a) violation, that claim also fails. The trial court merged the predicate offense of the aggravated assault of Cross (Count 4) into the malice murder of Cross (Count 1). Thereafter, the trial court purported to merge the violation of OCGA § 16-15-4 (a) Gang Act charge for the aggravated assault of Cross (Count 8) into the violation of OCGA § 16-15-4 (a) for the murder of Cross (Count 6). However, pursuant to our decision in *Anthony*, 303 Ga. at 403, Count 8 should have been vacated because, once the predicate offense for that Gang Act charge merged, there was "only one predicate crime to form the basis for unlawful participation in criminal gang activity in violation of OCGA § 16-15-4 (a)." *Anthony*, 303 Ga. at 406. In any event, because this left no conviction into which the other counts could have merged, the claim fails. See *Collett v. State*, 305 Ga. 853, 855 (1) n.2 (828 SE2d 362) (2019); *White v. State*, 287 Ga. 713, 714-715 (1) (a) (699 SE2d 291) (2010).

conclude that the Legislature intended that proof of intent to 'maintain' status or position in the gang would constitute a separate 'unit of prosecution' [in OCGA § 16-15-4 (b)] from proof of intent to 'increase' status or position in the gang." *Nolley*, 335 Ga. App. at 547. Accordingly, because the charges in Counts 47 and 48 are duplicative and resulted in Monroe being punished twice for a single offense, we vacate Monroe's convictions on Counts 47 and 48, and remand for resentencing on only one of those counts. See *State v. Owens*, 312 Ga. 212, 223 (6) (862 SE2d 125) (2021).[17]

---

[17] We note that Count 38 charged that Monroe unlawfully participated in criminal gang activity in violation of OCGA § 16-15-4 (b) by committing aggravated assaults against Cross, Kenneth, Darius, Calhoun, Clark, Ellis, and Harris with the intent to maintain his status or position in said gang. Then Count 39 charged that Monroe unlawfully participated in criminal gang activity in violation of OCGA § 16-15-4 (b) by possessing a firearm during the commission of the aggravated assaults of Cross, Kenneth, Darius, Calhoun, Clark, Ellis, and Harris. At sentencing, the trial court merged the aggravated assault of Cross (Count 4) and the possession of a firearm during the aggravated assault of Cross (Count 5) into other counts. Despite a portion of the predicate felonies listed in Counts 38 and 39 being merged, Monroe does not allege that the entirety of Counts 38 and 39 could or should have merged with the OCGA § 16-15-4 (b) counts charging Monroe with the murder of Cross and for possessing a firearm during the murder of Cross (Counts 34 and 35, respectively). Because any potential sentencing error on Counts 38 and 39 is not clear, and because the parties have not raised this issue on appeal, we do not address it. See *Dixon v. State*, 302 Ga. 691, 696 (808 SE2d 696) (2017) (holding that this Court may exercise its discretion to correct a merger issue

48

(b)   *Improper Sentencing Enhancement*

Monroe further alleges that the trial court erred by imposing a 10-year sentence for each of the weapons charges listed in Counts 11, 13, 15, 17, 19, and 21.   Monroe was tried on a 48-count indictment, which included seven charges of possession of a firearm during the commission of a crime.   Monroe was properly sentenced to five years on the first weapon charge (Count 3).   However, when the trial court reached the weapons charges in Counts 11, 13, 15, 17, 19, and 21, it determined that these charges were separate convictions triggering the enhancement provisions of OCGA § 16-11-106 (c), which states that, "[u]pon the second or subsequent conviction of a person under this Code section, the person shall be punished by confinement for a period of ten years."   This was error.

"The rationale for statutes imposing enhanced punishment is that the repetition of the unlawful conduct aggravates the guilt of the accused by demonstrating the incorrigible and dangerous

---

not raised by the parties where "[the] merger error is so clear and obvious that it comes to our attention even without the help of any party").

49

character of the accused, thereby establishing the necessity for an enhanced restraint." *Mays v. State*, 262 Ga. 90, 91 (1) (a) (414 SE2d 481) (1992). Where, as here, there are "several crimes arising from the same conduct [that] are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution." OCGA § 16-1-7 (b). Monroe was tried on a multi-count indictment in a single prosecution. He was not convicted of a crime until he was found guilty by a jury and a sentence was entered by the trial court. See OCGA § 16-1-3 (4) (defining "conviction" as "a final judgment of conviction entered upon a verdict or finding of guilty of a crime or upon a plea of guilty"). Because the weapons charge convictions in the instant case did not qualify as a "second or subsequent conviction" for sentencing purposes, Monroe could only be sentenced to five years on each count for possessing a firearm during the commission of a crime.

Based on the foregoing, the trial court erred by imposing separate 10-year sentences on Counts 11, 13, 15, 17, 19, and 21;

accordingly, we vacate these sentences and remand for resentencing in a manner consistent with this opinion.

*Judgment affirmed in part and vacated in part and case remanded. All the Justices concur.*